**UNITED STATES, Appellee,**

v.

**Kevin H. CANNON, Captain U.S. Air Force, Appellant.**

No. 64,743.
ACM 28017.

U.S. Court of Military Appeals.

Argued Jan. 8, 1991.

Decided Sept. 30, 1991.

For Appellant: *Captain Ronald A. Gregory* (argued); *Colonel Richard F. O'Hair* and *Lieutenant Colonel Jeffrey R. Owens* (on brief).

For Appellee: *Major Paul H. Blackwell, Jr.* (argued); *Lieutenant Colonel Brenda J. Hollis* (on brief); *Colonel Robert E. Giovagnoni* (on brief).

*Opinion of the Court*

EVERETT, Senior Judge:

In June of 1989, at Little Rock Air Force Base, Arkansas, Captain Kevin H. Cannon was tried by a general court-martial consisting of members. An extramarital liaison between appellant (a C–130 pilot) and Rebecca Long, the dependent wife of a maintenance crew chief, precipitated his general court-martial for conduct unbecoming an officer (adultery and sodomy "on divers occasions") and for willful disobedience of his commander's order to stay away from Mrs. Long, in violation of Articles 133 and 90, Uniform Code of Military Justice, 10 USC §§ 933 and 890, respectively. Captain Cannon was acquitted of the disobedience offense and the Article 133

offense based on sodomy but was found guilty of conduct unbecoming an officer by committing adultery on different occasions. He was sentenced to dismissal from the Air Force, which the convening authority later approved.

The Court of Military Review, after consideration of several assigned errors, affirmed his conviction and sentence. 30 MJ 886 (1990). We then granted review of these two issues:

**I**

WHETHER THE TRIAL JUDGE IMPROPERLY DEFERRED RULING ON APPELLANT'S MOTION *IN LIMINE* TO EXCLUDE UNCHARGED MISCONDUCT.

**II**

WHETHER THE ERRONEOUS ADMISSION OF UNCHARGED MISCONDUCT AND HEARSAY STATEMENTS PREJUDICED APPELLANT DURING FINDINGS.

**I**

**A**

Before his trial began, appellant submitted this motion *in limine:*

The accused respectfully moves, pursuant to Rules [for Courts–Martial] 403 and 404(b), to prohibit any discussion of the AFOSI investigation in Germany concerning allegations of misconduct against Capt Kevin Cannon. Said allegations pertain to a thirteen year old and a fourteen year old. The accused was never charged, and the investigation was suspended; and, therefore, it is not evidence of conviction or evidence of guilt. The prosecutor should be admonished not to mention said investigation.

The defense also moved to suppress testimony by Cassandra Stabila "that she either had an affair with the Accused, or had some sexual contact with the Accused, or had some suggestive contact with the Ac-

cused on one or more occasions, which is conduct not charged in these proceedings."

Replying to the defense motions, the Government asserted:

The prosecution does not intend to offer this evidence in our case-in-chief. We do, however, intend to present this evidence in rebuttal to defense evidence of good military character or to sweeping denials by the accused.

According to the prosecution:

M[il] R. E[vid.] 404(a)(1) allows the prosecution to rebut character evidence offered by the accused. The defense is entitled to present evidence of a relevant character trait of the accused. In this case, good military character would be relevant, but would open the door to inquiry into specific misconduct which reflects on that character. *See U.S. v. Donnelly*, 13 MJ 79 (CMA 1982); *U.S. v. Strong*, 17 MJ 263 (CMA 1984). The prosecution is not required to reveal the nature of evidence in rebuttal, but in this case, we do so to put the defense on notice of our intent. *See U.S. v. Trimper*, 26 MJ 534 (AFCMR 1988). Because the law is clear that "officers may be held to a higher standard," such evidence of philandering is proper rebuttal. *U.S. v. Guaglione*, 27 MJ 268 (CMA 1988); *U.S. v. Taylor*, 23 MJ 314 (CMA 1987).

When appellant's trial commenced, the military judge considered the defense motions concerning possible prosecution use of evidence of prior uncharged misconduct; and this discussion ensued:

MJ: It is my understanding the Government does not intend to use this evidence in their case-in-chief at all, correct?

TC: That is correct, ma'am.

MJ: And it would become an issue then only if possibly on rebuttal, should the Defense raise a defense of good military character?

TC: Yes, Ma'am. If the Defense raises good military character, we will have no choice but to rebut that with the evidence we have.

MJ: Does the Defense plan to raise that defense?

CIV DC: Your Honor, the accused has a good military character and we certainly intend to avail ourselves of that character. I would point out that there is no competent evidence of any misconduct in the affairs in Germany whatsoever. There is no way he can defend against that. We have a report that says he was cleared and then goes on to list all the gory details of what he was cleared of. That is not like being cleared. It also says it is not going to be in his personnel file, but apparently it is in some file somewhere because it is here.

TC: I have to disagree with Mr. Welch [civilian counsel]. There is nothing in the report indicating the accused was cleared of anything. The allegations were made. They were substantiated. A decision to take some action was taken. Apparently, the action that was chosen to be taken in Rhein Main was to do nothing at all. That doesn't mean that what he was accused of did not happen.

MJ: In what form is this evidence?

TC: We have one of the witnesses here on Little Rock Air Force Base. If necessary, we would call her. She is a sixteen-year old child who is available to testify in person as to what happened. We also have the OSI report with sworn affidavits from the other girls, as well as married women, who allege the accused engaged in improprieties with them. We have the affidavits. We have one of the witnesses who is prepared to testify.

CIV DC: Your Honor, as to the sixteen-year old girl who was not disclosed to us until this moment, if it is the one that I think it is because there is only one member on this base that was involved in that and I presume that is his child, that sixteen-year old girl gave evidence that she had no personal knowledge and had heard about the allegations against the accused from other girls, the two other girls who

were interviewed. There is no way to defend against it and I dispute Major Sarver [trial counsel] when he says there was anything substantiated. The SJA at Rhein Main decided not to prosecute for insufficient evidence. A finding of insufficient evidence is not a substantiation of charges.

Deferring her ruling on admissibility of any of the uncharged misconduct, the military judge stated:

*Well, at this time, since it really has not matured into a real issue at this point, I would defer ruling on the admissibility or inadmissibility until such time as it becomes an issue and allow time to do a little research in the meantime.*

(Emphasis added.)

Cannon's civilian defense counsel then requested:

CIV DC: We would ask also that the Government advise us if they have got—and be admonished to advise us in advance of bringing in any other uncharged conduct we haven't heard about before it gets before the members or any other reference to any other incident or related incident or alleged related incident having to do with the two we do know about. In other words, I want a[n Article] 39(a) [, UCMJ, 10 USC § 839(a)] session before the members hear about it.

Thereupon this exchange followed:

TC: As I said, we are not planning on bringing in any uncharged misconduct. If the Defense opens the door with military character, we will explore that with the witnesses that they call with "Do you know?", "Have you heard?" type questions to explore the basis for their opinion.

MJ: I don't think there is any problem with that, correct?

CIV DC: I think my inquiry is, can we have an agreement that in the absence of the declaration that the door has been opened, that we won't open it ourselves and start going into other stuff.

Finally, the military judge terminated the discussion and stated, "I will order the Trial Counsel to request a 39(a) prior to going into that type of evidence since I have not yet ruled on it."

Much later in the trial—during the direct examination of a defense witness, Captain Winston, who was appellant's neighbor—defense counsel asked, "Have you observed Captain Cannon's relationship during that period with his family? Did you see anything unusual?" The witness' reply was, "He has always been the perfect family man in my eyes."

Pursuant to the judge's earlier ruling, trial counsel asked for an Article 39(a), 10 USC § 839(a) session before cross-examining Captain Winston. At that time this discussion occurred:

TC: Your Honor, what I intend to inquire into deals with the statement by the witness that Captain Cannon is a perfect family man. I intend to inquire into affairs with Sandy Stabila. I intend to inquire into the affairs that Captain Cannon had while he was conducting TDY missions in a C–130 aircraft, and I intend to inquire into the incidents with a thirteen and fourteen year old girl in Rhein Main, Germany.

CIV DC: And the reason for that is because I asked the witness if during the period of time he was home he observed anything unusual with Cannon or his family and he said no, and then volunteered that he was a perfect family man?

Despite defense argument that Captain Winston's answer had been "nonresponsive" and should "be stricken," the military judge ruled that "the door has been opened" for cross-examination of the witness about his knowledge of appellant's character. However, the military judge reminded counsel that she did not "know anything about th[e] investigation" on which the prosecutor's questions would be based.

After the defense asked the military judge to "review" the information on which

cross-examination would be based, this colloquy took place:

> TC: Your Honor, I am going to do something I almost never do, and that is offer the Defense an out. I see this as perhaps something inadvertent, that they didn't intend to open this door. They did, but they didn't intend to. We would be satisfied with an instruction that testimony has been elicited that Captain Cannon was a perfect family man and that testimony should be completely disregarded by this court. Then we will not jump through that door.

> MJ: Is that acceptable to the Defense?

> CIV DC: I think I already said I would take that, Your Honor, yes, ma'am.

> MJ: I will so instruct the members [which she did].

The issue about admissibility of Cannon's uncharged misconduct recurred later in the trial when a court member asked at what time appellant had bought drugs at a veterinarian's clinic. During an Article 39(a) session, this exchange occurred:

> CIV DC: [I]n light particularly of the ... question by one of [the] court members about the time Captain Cannon appeared at the veterinarian, I would, again, request, this time in a much more limited scope, to place Captain Cannon on the stand for the limited purpose of telling what time he went to the veterinarian.

> MJ: Is there any objection to that procedure?

> TC: Any time a witness testifies, ma'am, they subject themselves to cross-examination as to their credibility and the motivation they have to lie. I am not going to simply let him get up there and say whatever he wants to say and let it go at that. I think there are probably other witnesses they could call to establish that limited fact, if they want.

> CIV DC: Your Honor, I don't know, first, if that is true. Secondly, there is a procedure for allowing a witness to testify, even an accused, for a limited purpose. I admit Major Sarver can question the witness about—cross-examine him about those things I go into with him on direct. But it seems to me that the prejudice I was talking to you about is even more emphasized now that a court member has shown us just the thing that here is something Captain Cannon can answer in reference to one of the two charges and he needs to at least be able to address that question.

> Now, if Major Sarver wants to ask Captain Cannon if he went to the veterinarian for some other purpose, that is fine, such as a pretext to then run by and have an affair with somebody, but I think we are entitled to explain to a limited purpose on this issue.

> MJ: Well, I agree that, of course, the accused can always take the stand for that limited purpose. But his credibility is always an issue the minute he testifies.

> CIV DC: Does that mean the prosecution can go into matters that aren't brought out on direct whether the door is not opened?

> MJ: Matters relating to credibility, as with any witness.

> CIV DC: And would it be the court's ruling that would open the door to asking Captain Cannon about any events that might have occurred in Germany or other uncharged conduct? He is not getting up there to testify about an affair. He is talking about a veterinarian. Certainly, I can see where—

> MJ: Let me try to pin down what we are talking about. You all seem to know all about this Germany affair and I don't know anything about it, except what you have told me which is he solicited two minor girls to have sexual intercourse and engaged in other improper activities with married women near Rhein Main.

> CIV DC: Which were found to be unfounded.

TC: Counsel keeps saying that, but that isn't so. The accused was, in fact, counseled by his commander regarding this activity. The decision was made not to go forward with any further action, but nothing ever said it was unfounded.

MJ: *I don't see that as going to credibility.*

TC: No, I don't see it going to credibility.

CIV DC: The notation is 430—

MJ: *I don't want to litigate that at this point because it is a moot issue at this juncture anyway.*

CIV DC: So this doesn't go to credibility.

MJ: I don't think that addresses credibility.

CIV DC: Then does any uncharged misconduct?

MJ: *Well, if it is probative of truthfulness.*

CIV DC: I don't think he has ever been asked about any uncharged conduct, nor is he seeking to testify about it. I don't know how that would go to his truthfulness.

MJ: *I don't know if there is any uncharged conduct that would be probative of truthfulness, so I can't answer your question.*

(Emphasis added.)

Thereafter, defense counsel continued to inquire what would be the permitted scope of cross-examination of appellant if he took the stand for the limited purpose of answering the court member's question. Trial counsel responded that he would "explore his motivation and that will include his affair with the victim in this case." Defense counsel persisted in his argument that appellant should be able to testify about the time of his visit to the veterinarian without opening up cross-examination as to anything else.

The military judge then warned:

MJ: You may do so, but you are opening yourself up to the prosecution going into credibility.

CIV DC: What does that mean, Your Honor?

MJ: I won't know until the question is asked. My crystal ball is cloudy at this point.

CIV DC: Does that mean that the prosecution can then go in and ask him if he had an affair with the woman and the court will hold that he has waived his rights against self-incrimination?

MJ: *I would probably sustain an objection to that question.*

(Emphasis added.)

Finally, defense counsel decided not to "put Captain Cannon on the stand for any purpose, limited or otherwise." However, the defense asked that appellant be allowed "to make an offer of proof" concerning what he would have testified to "were he allowed to make an appearance for the limited purpose."

Thereafter, the "offer of proof" was made outside the presence of the members through the testimony of Captain Cannon given in question and answer form. In the course thereof, Cannon described how he had unexpectedly encountered Rebecca Long on February 7, 1989, while he was returning from the veterinarian's office. The circumstances of this contact were especially material to the charge that Cannon had disobeyed the order to stay away from Rebecca Long—a charge of which he was ultimately acquitted.

## B

■ Cannon contends here—as he did unsuccessfully before the Court of Military Review—that the judge improperly deferred ruling on his motion *in limine* to exclude uncharged misconduct. However, our recent decision in *United States v. Sutton*, 31 MJ 11 (1990), is at odds with his position.

There, we repeatedly stressed "that the military judge ought to have considerable discretion in determining whether to defer ruling on motions *in limine*, despite the benefits of such motions by way of advance planning." *Id.* at 16. Elsewhere, the Court observed:

Since our decision in [*United States v. Cofield*, 11 MJ 422 (CMA 1981)], the Rules for Courts–Martial have been promulgated in the Manual for Courts–Martial, United States, 1984. Those rules reflect in a number of places the continuing sensitivity to the need for the military judge to have utmost flexibility in managing the course of a trial and reflect, as well, our considerations in *Cofield.*

*Id.* at 16.

In *Sutton,* we also noted that the Discussion of RCM 906(b)(13), Manual, *supra,* specifically states: "Whether to rule on an evidentiary question before it arises during trial on the general issue is a matter within the discretion of the military judge." *Id.* at 17. Finally, to leave no doubt, *Sutton* emphasized, "Under *Cofield* and the present Rules for Courts–Martial, a military judge has considerable discretion to defer rulings on *in limine* motions and thereby to avoid some of the problems which apparently concerned the Supreme Court in *Luce* [*v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984)]." 31 MJ at 17. Thus, *Sutton* does not support appellant's view that the military judge was required to rule immediately on his motion *in limine.*

Clearly, the military judge's decision to defer ruling on appellant's motion *in limine* was sensible, when, as she recognized—"it [admissibility of the alleged uncharged misconduct] really has not matured into a real issue at this point." Indeed, it was quite appropriate for her to "defer ruling on the admissibility or inadmissibility until such time as it becomes an issue and allow time to do a little research in the meantime." Even defense counsel appeared to understand that "the court would prefer to have the facts develop before it rules in general about this situation." Furthermore, the military judge was more than fair when she "order[ed] the trial counsel to request a 39(a) prior to

going into that type of evidence since I have not yet ruled on it."

In *United States v. Sutton, supra* at 13, the military judge made a pretrial ruling that a negative urinalysis report "could be used by the prosecution in" cross-examining potential defense character witnesses and in cross-examining the accused, if later he took the stand and denied ever having used drugs. In this case, however, the military judge did not rule on the defense motion *in limine,* and Cannon decided for his own benefit not to testify. *Cf. Luce v. United States, supra* (waiver because of defendant's failure to testify after losing a motion *in limine* to exclude potentially impeaching evidence).

■ Like the Court of Military Review, we acknowledge that the threatened admission of the uncharged sexual improprieties "did ... have a 'chilling effect' on the presentation of" good character evidence by the defense and probably "accounted for the decision not to" let Captain Cannon "testify at trial." 30 MJ at 889. However, we agree with the court below that

> there is no requirement that an accused and his or her counsel be free of a "chilling effect" created by legitimate impeachment or rebuttal evidence. The rules of evidence contain various recognized avenues or "doors" through which evidence otherwise inadmissible in a case-in-chief may legitimately be brought before the court in rebuttal. *See, e.g.,* Mil. R. Evid. 304(b)(1), 311(b)(1), 404(a), 404(b), 405(a), 405(c), 607, 608, 609(a), 612, 613, and 801(d). Tactical decisions by defense counsel, designed to keep such "doors" closed, are a legal fact of life and often call for foregoing the presentation of evidence or witnesses (including the accused) favorable to the defense.

30 MJ at 889.

■ Certainly appellant was not entitled to "have his cake and eat it, too," by testifying before the court members—even for a limited purpose—and then being exempt

from cross-examination as to his credibility.[1]

## II

Next, appellant complains that erroneous admission of uncharged misconduct prejudiced him during findings. First, he objects to statements by Mrs. Long to the OSI regarding her affair with Captain Cannon. Defense counsel had cross-examined her about certain inconsistencies between those statements and her testimony at trial. Then at the conclusion of the defense cross-examination, trial counsel moved to admit both of the statements in evidence. Defense counsel offered no objection to admission of one statement that he had used in impeachment, but as to a second statement, he objected "because it contains a number of things which have nothing to do with my cross or his direct." In response to a question by the military judge as to the purpose for which the statements were being offered, trial counsel described his purpose in these words:

> Under Military Rule of Evidence 106, Your Honor, the rule of completeness to show that her statement is absolutely consistent with what she testified here in court. The Defense Counsel is attempting to impeach her on some point from a six page statement in order to try to infer that somehow she has forgotten something or is mistaken. I am offering this to show that the bulk of the statement, 99.9 percent of this statement is absolutely consistent with everything she said here in court today because it is the truth.

The military judge admitted the exhibit without any limiting instruction.

■ On appeal to the Court of Military Review and to our Court, appellant complains that the first statement contains a recital by Mrs. Long that Cassandra Stabila, a teammate from her softball team (which appellant coached), had "told me she and CANNON had also had a sexual rela-

tionship." In the second statement, Mrs. Long provided additional detail about her teammate's description of the sexual relationship with appellant.

As the Court of Military Review recognized, this evidence was inadmissible. 30 MJ at 890. In the first place, the statement recites comments by a third person which are clearly hearsay. Secondly, even a prior consistent statement by a witness who has been impeached is only admissible for a limited purpose and under several conditions not complied with here. Thirdly, the "rule of completeness" under Mil.R. Evid. 106, Manual, *supra*, would not justify admission of an entire statement by an impeached witness merely to show that one segment of it was consistent with her testimony. Finally, despite trial counsel's relentless quest to introduce evidence of uncharged misconduct, he was no more entitled to have it admitted in this indirect way than he would have been if the woman who told Mrs. Long about her affair with Captain Cannon had been testifying in his trial.

■ The Court of Military Review recognized that, as to the first statement, defense counsel had failed to object; but it "decline[d] to find waiver" because

> [f]irst of all, neither of trial counsel's theories of admissibility justified the admission of this uncharged misconduct from either of the statements. Secondly, the offer of these statements into evidence, inasmuch as they contained this uncharged misconduct, violated an earlier order by the trial judge that required the trial counsel to request an Article 39(a) session before "going into" such matters.

30 MJ at 890–91 (footnote omitted). This ruling by the court below was quite correct. Of course, the defense had objected to the second more detailed statement; so the Government could not even claim waiver as to that one.

1. Of course, if the accused had testified in his own behalf, he would not lose his right to refuse to answer a question on grounds of self-incrimination if the cross-examination as to credibility delved into uncharged misconduct. *United States v. Castillo,* 29 MJ 145 (CMA 1989).

Despite reception of this inadmissible evidence at trial, the Court of Military Review affirmed the conviction because it found "the evidence of appellant's guilt of the adulterous behavior overwhelming. As such, we are confident that this error, at least as to findings, was harmless." 30 MJ at 891. Appellant insists that this conclusion was in error—especially in light of other claimed evidentiary errors.

■ One of those errors concerned testimony from Lieutenant Colonel Mentemeyer, appellant's commander, to the effect that appellant's wife knew of the affair with Mrs. Long and "could have divorced him." This information was adduced on redirect examination, in regard to the issue of whether Mentemeyer had given appellant an order not to associate with Mrs. Long.

In his direct examination, trial counsel established that Cannon had contacted Mentemeyer and had attempted "to preempt" any complaints from the Longs about his conduct by telling Mentemeyer that he was having troubles with them. Mentemeyer testified that he had believed Cannon at that time and continued to believe him for a while thereafter. Defense counsel then cross-examined Mentemeyer at some length about the "order" and tried to establish that it had been more in the form of advice—rather than a command, as that term is used in Article 90 of the Uniform Code.

On redirect by trial counsel, Mentemeyer stated that he had believed appellant's version of events until he received "other information." Trial counsel then asked him if some of that information had come from appellant's wife; and defense counsel made a timely objection that this was "a blatant attempt to get in hearsay." However, the objection was overruled; and Mentemeyer was allowed to testify that Ms. Cannon had told him "that she knew what he had done and that, yes, she could have divorced him."

We conclude that this evidence was inadmissible on redirect examination. Even though, in connection with another charge, it was necessary for the Government to establish that Cannon's commander, Lieutenant Colonel Mentemeyer, had given him an order not to associate with Mrs. Long, it was neither necessary nor permissible, over defense objection, for Mentemeyer to describe all the information that he had received which prompted his giving the order. The situation is like that present in cases where we have held that an investigator who targets an accused for purposes of surveillance or a "controlled buy" of drugs cannot testify before a court-martial about all the hearsay information he received that led him to take this action. *United States v. Gaeta*, 14 MJ 383, 389 (CMA 1983).

■ A similar problem is presented by the prosecutor's introduction of evidence about a telephone conversation between Mrs. Long's husband, Airman Jimmy Long, and appellant's wife, Gail Cannon. Initially Mrs. Long had referred to this conversation; but before she detailed any of the specifics, she was halted by defense objection. Subsequently, when Airman Long testified, he, too, referred to the telephone conversation with Mrs. Cannon. After a defense objection on hearsay grounds, an Article 39(a) session was conducted, at which trial counsel explained why he thought the contents of the conversation were admissible. He explained that the evidence was

> not offered for the truth of the matter, but offered as showing how the witness learned of what happened; that even if what Ms. Cannon said were not true, the fact that she said the words to this witness caused him to get into an argument, a fight, and beat up his wife. So whether or not it is offered for the truth of the matters asserted, the fact that it was said is absolutely relevant and admissible.

Initially the military judge stated, "Well, I don't see any way around what Mrs. Cannon told Airman Long is hearsay. I don't see any exception that it fits." However, after trial counsel reiterated that the statement made by Mrs. Cannon was being

offered not because of its truth, but because immediately thereafter Airman Long "went and beat up his wife," the military judge decided to allow the evidence and to "instruct the members the purpose for which it is admitted."

Subsequently, in response to a further question by the trial counsel, Airman Long testified, over renewed defense objection:

I was on the phone with Captain Cannon originally and then Gail got on the phone and she said they had their little rendezvous. I said, "What do you mean by rendevous?" She said, "They had sex." I said, "Where and when? I mean, how did this happen?" She said, "I don't know where it all happened. All I know is it did happen. He told me it happened." And she said, "This is not the first time it happened." ... She said that the sex had happened. She said, "I even had my Aids test done because of it." She said they had planned—that Kevin had told her that they had planned to put her in some kind of mental institution and him and Becky get married. Then I asked her another question. I don't know exactly what the question was, but she started going into some gory details and that is when I hung up and I asked Becky was it true and Becky said yes, and that is when I beat her.

For the same reasons that Mrs. Cannon's comments to Lieutenant Colonel Mentemeyer were inadmissible, her telephone conversation with Airman Long was inadmissible. Despite limiting instructions given by the military judge "that the hearsay testimony is being elicited, not for the truth of the matters stated, not that it is true necessarily, but to explain why Airman Long took subsequent actions that he took," we conclude that the evidence should not have been received. In the first place, it would be very difficult for the court members to give no credence to a reported comment by

Cannon's wife that he had engaged in intercourse with Rebecca Long. Secondly, it seems especially objectionable to smuggle into the record in this manner the out-of-court assertions of a declarant who could not be compelled to testify against appellant and whose testimony, if she did testify, would be subject to the husband/wife privilege. *See* Mil.R.Evid. 504.

We also are not fully convinced of the relevance of Airman Long's testimony that he beat up his wife after receiving a report that she had been involved in an affair with Captain Cannon. Although this action on his part certainly demonstrates the sincerity of his belief that his wife had been involved in adultery, it does not show that the information he had received was trustworthy.[2] Because Airman Long's beating of his wife has very limited relevance, introduction of prejudicial hearsay evidence to explain why he beat his wife is even less defensible.

■ In light of the evidentiary errors we have discussed—some of which were also identified by the Court of Military Review—we must determine whether the harmless error doctrine applies here. *See United States v. Mann,* 26 MJ 1 (CMA 1988); *United States v. LeMere,* 22 MJ 61, 69 (CMA 1986). The court below concluded that it did, because, in its view, the evidence of adultery was "overwhelming." 30 MJ at 891.

Certainly Mrs. Long's testimony seems straightforward and is convincing. Moreover, it is corroborated to some extent by motel records and by some incriminating admissions on the part of Captain Cannon. However, the defense offered substantial evidence to impugn Mrs. Long's credibility and to explain some of the Government's evidence. Thus, even though appellant did not take the stand—as he had a perfect right not to do—we certainly cannot say

---

2. Airman Long's violent reaction when he became convinced that his wife had engaged in adultery with Captain Cannon does at least tend to suggest the adverse effect on discipline and morale when an officer engages in adultery with the wife of an enlisted member. However,

it is unclear that Airman Long would have been much less concerned—or would have refrained from beating up his wife—even if her adulterous relationship had been with another enlisted person or with a civilian.

that all the evidence in the record points to guilt. We simply are not convinced that the error in receiving incriminating hearsay evidence was harmless. Accordingly, Captain Cannon is entitled to a rehearing.

## III

The decision of the United States Air Force Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

Judge COX concurs.

SULLIVAN, Chief Judge (dissenting):

I would affirm since I, like the court below, find that this is harmless error. Art. 59(a), Uniform Code of Military Justice, 10 USC § 859(a).