UNITED STATES, Appellee

v.

John M. REVELES, Airman First Class
U.S. Air Force, Appellant.

No. 93–1169.
CMR No. 29029.

U.S. Court of Appeals for
the Armed Forces.

Argued Oct. 4, 1994.

Decided Feb. 28, 1995.

Appellant: *Captain Eric N. Eklund* (argued); *Colonel Jay L. Cohen* (on brief); *Colonel Terry J. Woodhouse* and *Captain David D. Jividen.*

Appellee: *Captain Jane M.E. Peterson* (argued); *Lieutenant Colonel Thomas E. Schlegel* (on brief); *Colonel Richard L. Purdon* and *Colonel Jeffery T. Infelise.*

*Opinion of the Court*

GIERKE, Judge:

1. A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of reckless driving and involuntary manslaughter, in violation of Articles 111 and 119, Uniform Code of Military Justice, 10 USC §§ 911 and 919, respectively. The approved sentence provides for a bad-conduct discharge, confine-

ment and partial forfeitures for 30 months, and reduction to the lowest enlisted grade. The Court of Military Review * affirmed the findings and sentence in an unpublished opinion.

2. This Court granted review of the following issues:

I

WHETHER THE MILITARY JUDGE ERRED TO THE PREJUDICE OF APPELLANT BY IMPROPERLY LIMITING THE DEFENSE SENTENCING CASE BY THE USE OF A CHILLING THREAT TO ADMIT PROSECUTION EXHIBIT 20, A VIDEO TAPE ENTITLED "IN CELEBRATION OF THE LIFE OF [THE VICTIM]," MADE BY THE FUNERAL HOME HANDLING THE DECEDENT, SHOULD HE DECIDE AFTER THE DEFENSE SENTENCING CASE THAT THE DEFENSE CROSSED THE LINE "IN TERMS OF EMOTIONAL APPEAL" TO THE COURT MEMBERS.

II

WHETHER THE MILITARY JUDGE ERRED TO THE PREJUDICE OF APPELLANT BY TWICE DENYING THE PRODUCTION OF DR. (MAJOR) DAVID D. HAUSE TO TESTIFY ON THE MERITS FOR APPELLANT.

III

WHETHER THE MILITARY JUDGE ERRED TO THE PREJUDICE OF APPELLANT BY DISALLOWING EVIDENCE PROFFERED BY MS. JILL E. PAGE, A DEFENSE WITNESS ON THE MERITS, THAT THE DECEDENT HAD A REPUTATION IN THE COMMUNITY FOR INTEMPERANCE.

3. The charges in this case arose from a fatal automobile accident. Appellant was intoxicated and was driving at nearly twice the speed limit. He crossed the center line of the road and collided with a van. The driver

* *See* 41 MJ 213, 229 n. * (1994).

of the van was killed, and her passenger was seriously injured.

4. The prosecution theory was that appellant's intoxication and reckless driving constituted gross negligence which was the proximate cause of the victim's death. The defense theory was that there were intervening causes for the victim's death: (1) negligence by German paramedics who did not properly support the victim's neck when they removed her from her van; (2) failure of the victim to wear a seatbelt; and (3) the possibility that the victim's ability to avoid the collision was impaired by her intoxication. The second and third granted issues arise from the military judge's rulings regarding defense evidence intended to establish the intervening causes.

5. We conclude that no prejudicial error occurred, so we affirm.

## ISSUE I: THE VIDEOTAPE

6. During the sentencing hearing, the prosecution offered a videotape containing 17 pictures of the victim, along with pictures of family and friends, interspersed with scenes from the Oregon countryside. The sound track includes scriptural passages and the song "Love Story."

7. The defense objected on the ground that the videotape was too inflammatory, akin to waving the "bloody shirt." Trial counsel's rationale for admitting the tape was as follows:

> It's anticipated that the accused is certainly going to try to give the jury members a little bit more fleshing out as to [who] he is and what he's all about ... But there's another side to this story, not just the accused's. There's a side of the person that we're here for, and that is for [the victim], and the impact and the person that she was that this accused is responsible for killing.... It's the prosecution's contention that this is certainly not an overly emotional videotape or piece of evidence for the court to consider. It does allow them to have a broader view of who [the victim] is.

8. After viewing the videotape and hearing the arguments of counsel, the military judge sustained the defense objection. The military judge did not specifically rule on the question whether the videotape was admissible as victim-impact evidence, since the controversy was solely about the inflammatory nature of the tape. The military judge then cautioned the defense as follows:

> You're on notice. In opening argument, before I saw the tape, the trial counsel made an extremely good point in what the defense might attempt to bring before the court members in terms of the accused's life. And I'm telling the defense right now that if testimony goes along those lines which I consider to be such that the government could fairly comment with slices of the deceased's life, I will reconsider my ruling and although it might not technically be rebuttal in the classic sense, I would treat it as rebuttal, depending on what the defense presents about the accused's life. And I may very well let the court members see that tape.
>
> If I do that, however, I will not let the sound go on. It will be a tape showing pictures, but not with any music or singing. Do both sides understand my ruling?

TC: Yes, Sir,

> (Talking to the defense) I see you whispering over there. Don't misinterpret me. I'm not trying to put any chill on the defense or cut you off or prevent you from presenting evidence. I'm just saying that I think trial counsel's point is very well taken, and I will watch closely what you present, and then I may reconsider my ruling. Okay?
>
> \*   \*   \*
>
> And if I feel that too much of an emotional appeal is being made by the defense to the court members, I'll let the government counter that with that tape without the sound. Understood?
>
> \*   \*   \*
>
> So you may want to talk to your witnesses along those lines before we go on.

9. Appellant now contends that the military judge's admonition "improperly curtailed and chilled the appellant's presentenc-

ing case." Final Brief at 7. Our review of the record leads us to a contrary conclusion.

10. The defense case on sentencing included testimony of family members, supervisors, and the sworn testimony of appellant. Appellant's father testified that appellant was an "outstanding" son and that the accident was "[v]ery very emotionally upsetting" to appellant. Appellant's mother testified that appellant is a "sensitive, honest, and dependable person" and that the accident "affected him very deeply."

11. Captain Robert Voce testified that appellant is his wife's cousin and that he knows appellant "pretty well." He described appellant as a "responsible individual" who is "deeply hurt and deeply sorry for what has happened."

12. Mrs. Caroline King, a volunteer worker in the local alcohol education and rehabilitation program, testified that appellant was enrolled in the program by his commander. She testified that appellant's attitude toward the program was "very good." She said that appellant became "very emotional" when he talked about the accident. Finally, Mrs. King testified that the noncommissioned officer in charge of the program was a friend of the victim and was initially reluctant to work with appellant, but "as the two weeks [of the program] progressed, she had great empathy for him."

13. The defense presented testimony from six of appellant's military supervisors: Lieutenant Colonel Barnes, his squadron commander; Captain Platte and Staff Sergeant Baldwin, former supervisors; and Master Sergeant Moreno, Staff Sergeant Medeiros, and Sergeant Ackels, his current supervisors. All testified favorably about his duty performance and personal qualities.

14. Finally, appellant testified under oath, outlining where he was born and what he had done before enlisting in the Air Force. He described the death of one of his three brothers and the comfort he received from his then-girlfriend, whom he married around the end of their senior year in high school. He described his Air Force assignments. Appellant concluded his direct testimony as follows:

I just wanted to express my sorrow to the family, not to the other people, anybody else, you know. I know how the family feels and how hard it must be going through this, because you don't get over something like this; you just don't get over it, you know. I know I won't. It's something that stays with you for your whole life. You never get over it; you just got to learn to live with it. And I'm very sorry.

Q. Airman Reveles, have you learned anything from this?

A. Yes, sir, I have. I learn[ed] that you tend to take life for granted and thank God that he gave me a second chance. (The accused became emotional.)

Q. Are you going to just blow this off and chalk it up, once this court is over?

A. Even if I wanted to I don't think I could. I just never stop thinking about it.

Q. Airman Reveles, these six men here are going to make an important decision here in a little bit. Do you have anything that you would like to say to them?

A. Other than the fact that I respect their decision and whatever sentence I get, and the only people I'm concerned about is, of course, the victim's family and my wife and daughter.

15. At the conclusion of the defense case, trial counsel again asked the military judge to permit introduction of the videotape. Trial counsel argued that the testimony of appellant's parents, the volunteer worker in the alcohol rehabilitation program, and the fact that "the accused himself sat in there crying before the court members, both during the testimony of these witnesses and during his own testimony," had opened the door for admission of the videotape. After argument by both sides, the military judge ruled: "I'm satisfied the defense kept it in reasonable bounds. I'm going to adhere to my earlier ruling."

16. The defense did not object to the military judge's ruling or admonition at trial and made no offer of proof at trial or on appeal regarding what evidence would have been presented in the absence of the military judge's admonition.

17. The question before us is whether the military judge impermissibly "chilled" presentation of the defense case by proposing to admit the videotape. An accused is not entitled to present his sentencing case "free" from the "chilling effect" of "legitimate" prosecution evidence. *See United States v. Cannon*, 33 MJ 376, 382 ¶ 23 (CMA 1991). We do not reach the question of admissibility, because appellant has failed to show that the military judge "chilled" presentation of his case in any way. The record contains evidence from appellant's family, former supervisors, current supervisors, and appellant himself, demonstrating his personal character, family and personal background, military proficiency, remorsefulness, and potential for rehabilitation. Appellant has not described what more he would have presented, and we are hard pressed to imagine what more could have been presented.

## ISSUE II: TESTIMONY OF MAJOR HAUSE

18. The defense theory was that the victim was still alive after the accident but that her spinal cord was severed when the German medical personnel negligently removed her from her vehicle without immobilizing her neck. Technical Sergeant (TSgt) Kenneth Ross was driving a short distance behind the victim's vehicle and "thought there was an accident." He parked his vehicle and approached the passenger's side of the victim's vehicle. He testified that he noticed the victim's left arm behind her head and he saw her hand make a single "up and down movement."

19. He began to check the passenger's pulse, but when he heard the passenger breathing, he stopped. He heard appellant calling out and saw him lying on the ground outside his vehicle. After checking appellant's condition, TSgt Ross returned to the victim's van, told a German passerby to summon the police and an ambulance, and attempted to calm down and reassure the passenger, who was "screaming in pain." TSgt Ross then looked into the driver's side window, which was rolled down, and thought he heard the victim breathing. He did not check her pulse. He later heard someone, who was never identified, say that they had checked for a pulse and "she has one."

20. The German paramedics arrived, and after a while—stipulated to be 15 minutes after the accident—one of the paramedics asked TSgt Ross to assist them in removing the victim from her vehicle. The paramedic lifted the victim "with his arms underneath her armpits." TSgt Ross lifted her knees, and they pulled her out of the van and laid her on the ground. TSgt Ross testified that the paramedic was supporting the victim's head as he lifted her, "but I can't say for sure if it was [with] his upper arms or his chest."

21. The theory of the prosecution was that the victim was killed by the impact of the collision. Dr. Willie Ulrich, a German medical doctor, testified that when he arrived on the scene, the victim had already been removed from her vehicle, but his "leading medical assistant" informed him that before they removed her from the vehicle, they had determined that she was not breathing, her pupils had dilated and did not "react to light, and she had no heart beat." Neither side requested that the paramedics be called as witnesses.

22. Dr. Ulrich examined the victim and determined that her neck was broken "[u]p here very high" in the area of the first and second vertebrae. Dr. Ulrich pronounced the victim dead at the accident scene. Based on his examination and the information received from the paramedics, Dr. Ulrich opined: "The impact of the accident was so heavy that she broke her neck by having the belt on, and you get an impact, then her head goes around and spins around and then it breaks by the heavy impact, sideways."

23. The defense attempted to obtain expert-witness testimony to support their theory that there was an independent intervening cause of death. On July 11, 1990, 5 days before the beginning of trial, defense counsel requested that Major David W. Hause, M.D., a board-certified forensic pathologist, be produced as a defense witness. Appended to the witness request was a summary of defense counsel's telephonic conversation with

Maj Hause, who had been transferred from Landstuhl, Germany, to Fort Hood, Texas. Defense counsel represented that Maj Hause would testify that in any case involving a suspected neck injury, "it is extremely important to immobilize the neck before trying to move the person." Failure to do so "could result in death." Maj Hause also would testify that severing the spinal cord in the areas of the fifth through eighth vertebrae would cause "loss of hand and arm movement as well as movement of other parts of the body below the arms," whereas severing the spinal cord in the area of the second and third vertebrae would cause "cessation of breathing."

24. Defense counsel represented that Maj Hause would testify that the movement of the victim's hand "would indicate the spinal cord was not severed above about the fifth through eighth vertebrae during the accident." Lastly, Maj Hause would testify that the lack of skid marks would cause him to investigate "the decedent's ability to function prior to the accident."

25. The convening authority denied the request for the personal attendance of Maj Hause. Colonel James P. DeSantis, M.D., a board-certified emergency medicine doctor, was made available to the defense for both consultation and potential testimony. In a pretrial request that Col DeSantis be summoned to testify as a defense witness, defense counsel represented that Col DeSantis would testify that, "based on the type of care [the victim] received from the German medical personnel following the accident, he cannot rule out the possibility that [the victim's] death was caused by the treatment and not by the accident."

26. On the first day of trial, July 16, defense counsel challenged the convening authority's refusal to order the personal appearance of Maj Hause. After considerable argument and discussion, the military judge on July 17 upheld the convening authority's refusal on two grounds: (1) that defense counsel was "unable to sufficiently connect Hause's proffered testimony to anything in the case ... that's going to be presented by the Government or the defense, such that

Hause would be helpful to the factfinder," and (2) that Col DeSantis "can adequately cover the area for the defense."

27. On July 23, defense counsel again requested the personal testimony of Maj Hause. Between July 16 and July 23, defense counsel had decided not to call Col DeSantis as a defense witness, apparently because Col DeSantis, "for reasons not clearly known to the Defense, ha[d] tightened dramatically the scope of his prior expected testimony." Defense counsel had entered into a stipulation of the expected testimony of Col DeSantis, but later had decided not to offer the stipulation because "Dr. DeSantis' testimony as it currently stands is not beneficial to the defense."

28. The military judge again refused to compel the personal appearance of Maj Hause. This time he found Maj Hause's testimony relevant on the issue of independent intervening cause, "not wholly cumulative," but not "necessary" within the meaning of RCM 703(b)(1) and Discussion, Manual for Courts–Martial, United States, 1984. The military judge concluded that Maj Hause's basis for his expert opinion was "not of a type reasonably relied upon by experts in forming their opinions, that is, getting the information strictly from the defense counsel without reviewing any report, materials, or witness statements in the case." He concluded that "Dr. Hause's lack of familiarity with the evidence in the case, which would surely be apparent to the members, would, in the court's opinion, effectively neutralize any helpfulness of the proffered testimony to the defense case." Last, the military judge concluded that defense counsel's failure to provide materials to Maj Hause for his review, failure to act when they learned that Maj Hause was being reassigned, and untimely request "all run contrary to defense counsel's stated position." The military judge observed that if the defense had considered Maj Hause an important witness, they "surely would not have approached the issue with such apparent inattention."

29. We hold that the military judge did not err. The standard of review for rulings denying requests for production of

witnesses is abuse of discretion. *See United States v. Moore*, 32 MJ 56, 61 ¶ 13 (CMA 1991); *United States v. Tangpuz*, 5 MJ 426, 429 ¶ 11 (CMA 1978). In *Moore*, this Court determined that "the vast distance" between the location of the trial and the witnesses, as well as "the untimeliness" and the "irregularity" of the request gave "some" support to the military judge's refusal of the request for production of a witness.

30. RCM 703(b)(1) provides: "Each party is entitled to the production of any witness whose testimony on a matter in issue on the merits or on an interlocutory question would be relevant and necessary." Testimony is "necessary" within the meaning of this rule "when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way on a matter in issue." RCM 703(b)(1), Discussion.

■ 31. Mil.R.Evid. 703, Manual, *supra*, provides that an expert opinion will be based on "facts or data ... perceived by or made known to the expert, at or before the hearing." Although an expert witness may respond to hypothetical questions, those questions must be based on facts in evidence or which will be placed in evidence. Accordingly, to demonstrate that a requested expert witness is "necessary" within the meaning of RCM 703(b)(1), the requesting party must demonstrate that the witness can offer an opinion based on facts or data related to the issue in question. *Cf. United States v. Kladouris*, 964 F.2d 658, 669 ¶ 22 (7th Cir.1992) ("absence of factual basis" for expert opinion "always justifies exclusion" of testimony); *United States v. Dotson*, 799 F.2d 189, 193 ¶ 22 (5th Cir.1986) (court should require expert witness to identify factual basis or source of opinion); *United States v. Wilson*, 798 F.2d 509, 517 ¶ 32 (1st Cir.1986) (expert testimony not based on evidence of record is "excludable as guesswork, conjecture and speculation"); *United States v. Varoz*, 740 F.2d 772, 775 ¶ 7 (10th Cir.1984) (expert testimony "must be accompanied by presentation of the facts and premises underlying the expert's opinions and conclusions").

■ 32. The defense request fell short of a showing of necessity. As noted by the military judge, the defense made no showing that Maj Hause's testimony would be based on the actual facts of the case. The most that the defense could proffer was that Maj Hause would testify that there was a theoretical possibility that the victim's death was caused by failure of German medical personnel to immobilize her broken neck before attempting to extricate her from her vehicle. Whether Maj Hause would adhere to his opinion when advised of the evidence in the case was not shown.

33. The defense request also was untimely. The first request for Maj Hause's attendance was made on the fifth day before appellant's trial commenced. Maj Hause was in Texas and the court-martial was in Germany. Although defense counsel had consulted with Maj Hause, knew that he had been reassigned, and had tendered his expected testimony at the Article 32, UCMJ, 10 USC § 832, investigation, they took no action to obtain his personal presence until 5 days before trial. The second request was made on the fifth day of trial, after Dr. Ulrich had testified and defense counsel had decided not to present the testimony of Col DeSantis.

34. Furthermore, defense counsel failed to show why any of the other pathologists in Germany could not provide the same testimony. An accused is entitled to competent expert assistance but is not "entitled to an expert of his own choosing." *United States v. Burnette*, 29 MJ 473, 475 ¶ 8 (CMA), *cert. denied*, 498 U.S. 821, 111 S.Ct. 70, 112 L.Ed.2d 43 (1990).

■ 35. Finally, the intervening causes alleged by the defense would not have constituted a defense in any event. To be the proximate cause of the victim's death, para. 44b(2)(b), Part IV, Manual, *supra*, appellant's conduct "need not be the sole cause of death, nor must it be the immediate cause—the latest in time and space preceding the death." It must only play "a material role in the victim's decease." *United States v. Lingenfelter*, 30 MJ 302, 307 ¶ 22 (CMA 1990), *quoting United States v. Cooke*, 18 MJ 152, 154 (CMA 1984). In this case an intervening cause arising from the negligence of the par-

amedics or the victim herself would be a defense only if "the second act of negligence looms so large in comparison with the first, that the first is not to be regarded as a substantial factor in the final result." 30 MJ at 307 ¶ 22. The proffered defense evidence fell short of this standard.

36. In light of the untimeliness of the defense request, the distance between the witness and the court-martial, the failure of the defense to demonstrate that no other pathologist could provide the same testimony, the failure of the defense to show a factual basis for Maj Hause's proffered testimony, and the marginal relevance of the requested testimony, we hold that the military judge did not abuse his discretion in denying the request for the personal appearance of Maj Hause.

## ISSUE III: REPUTATION TESTIMONY

37. The defense attempted to introduce testimony from a bartender at the Bitburg Officers Club that the victim had a reputation among club patrons for intemperance. The military judge refused to permit the bartender to testify about the victim's reputation in the community, but he permitted her to give her opinion regarding the victim's intemperance. The bartender testified that, in her opinion, the victim "liked to drink . . . liked to party." The Court of Military Review upheld the military judge's ruling on the ground that patrons of the club bar were not a recognized community within the meaning of Mil.R.Evid. 405(d). Unpub. op. at 9.

■ 38. The definition of "community" applied by the military judge and the Court of Military Review may have been unduly restrictive. The definition of "community" in Mil.R.Evid. 405(d) is inclusive rather than restrictive. It "includes a post, camp, ship, station, or other military organization regardless of size." The definition of "community" in Mil.R.Evid. 405(d) was taken from paragraph 138*f* (1), Manual for Courts-Martial, United States, 1969 (Revised edition), but was "broadened" to add the words, "regardless of size." Drafters' Analysis of Mil. R.Evid. 405, 1984 Manual, *supra* at A22–33 (Change 2). We believe that an inclusive

view of "community" would include social groups as well as geographical neighborhoods and military organizations.

39. The previous rule (1969) also required that reputation testimony be given by "someone whose knowledge of that reputation was gained from having himself been a member of the community in question." Para. 138*f* (1). That requirement was eliminated from Mil.R.Evid. 405, but the proponent of the evidence still must show that the witness is "sufficiently linked to the community" to be competent to speak for the community regarding the individual's reputation. *See* S. Saltzburg, L. Schinasi, and D. Schlueter, *Military Rules of Evidence Manual* 495 (3d ed. 1991); Drafters' Analysis of Mil.R.Evid. 405(a), *supra.*

40. In this case the bartender was prepared to testify that the victim had a reputation for intemperance among some employees as well as the patrons of the Officers' Club bar. She described the patrons as including the school teachers with whom the victim worked, civilian employees at the base, and the pilots from the base. The Officers' Club employees clearly are an identifiable work group. Any of the other social groups, individually or in the aggregate, might constitute a "community" if it could be shown that they were composed of the same people who regularly assembled on an ad hoc basis to socialize. What was lacking in this case was sufficient foundation evidence defining and identifying the "community" involved and establishing that the bartender was competent to speak for that community. *See United States v. Toro*, 37 MJ 313, 317 ¶ 18 (CMA 1993) (setting out proper foundation for reputation testimony).

■ 41. In any event, we need not decide whether the military judge or the Court of Military Review erred. Since the substance of the testimony was presented to the court members as opinion evidence, any error in refusing to accept it as reputation evidence was harmless. *See* Advisory Committee Notes on Fed.R.Evid. 405 (reputation evidence is "opinion in disguise").

## DECISION

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX and CRAWFORD concur.

WISS, Judge (concurring in part and in the result):

I concur with the majority's treatment of Issues I and III. As to Issue II, I do not believe that it is so clear that the defense request for Major Hause's appearance as an expert witness "fell short of a showing of necessity" in the context discussed by the majority and "also was untimely." 41 MJ at 394 ¶¶ 32 and 33. I do agree with the majority, however, that "the intervening causes alleged by the defense," which Major Hause would have addressed, "would not have constituted a defense in any event." 41 MJ at 394 ¶ 35. Thus viewed, Maj Hause was not a necessary witness, for the simple reason that his proffered testimony was not relevant. Accordingly, I agree with the majority's rejection of appellant's claim of error in this regard.