*889 OPINION OF THE COURT
MORGAN, Judge:
Convicted, inter alia,[1] of premeditated murder, appellant was sentenced to a dishonorable discharge, confinement for life, total forfeitures, and reduction to airman basic. On appeal, he asserts seven errors, discussed below. Finding that none of these asserted errors prejudiced his substantial rights, we affirm.
FACTS
In April of 1992, following a torrid, and at times tempestuous courtship, appellant married Marie Annastasia (Mary Ann) who had within the preceding two weeks divorced her husband of eight years. According to appellant, the marriage was troubled from the beginning by frequent, and at times violent arguments, aggravated by heavy drinking by both parties. Matters came to a head on August 13, 1992, when, following an argument in which Mary Ann Willis declared her resolve to divorce appellant, he forced her into a closet in their mobile home, turned on a propane tank, and lit a match. It turns out that propane is a highly unpredictable and capricious incendiary which did not behave as the appellant expected. The gas is heavier than air, falls towards the floor, and does not necessarily immediately light on contact with flame. Mrs. Willis received second degree bums along the front of her legs. Appellant was burnt less severely on the backs of his legs and, tellingly, on his left forearm and hand, which most likely held the match to the gas.
At appellant’s urging, his wife acquiesced in a story which claimed that the incident was an accident, that she had (or appellant had) lit a match for a cigarette and that the propane tank was leaking. Hospitalized for a few weeks, recovering from her bums, Mrs. Willis returned home, and reaffirmed to appellant her determination to leave him. This resulted in yet another assault, witnessed by neighbors, in which appellant attempted to choke her.
Investigation into the fire, which had been desultory in view of the agreement by both Willises that it was an accident, was renewed in earnest when Mrs. Willis disclosed to investigators that it had been deliberate. While the investigation was ongoing, appellant was sent first to Charleston Naval Hospital, and then to the Alcohol Rehabilitation Center (ARC) at Sheppard Air Force Base (AFB), Texas. Psychological work-ups at both places revealed that appellant had no organic mental disease or defect, but that he did suffer from alcoholism which worsened his already-poor impulse control.
While at the ARC, appellant telephoned his aunt, Wilma Plybon, who had been instrumental in his rearing during his last three years of high school. He confided to her that he envisioned committing the “perfect crime” by murdering his wife, and that he wanted to see the fear in her face as she was being killed. This sufficiently alarmed Mrs. Plybon that, notwithstanding her promise not to tell anyone, in due course it was reported to Air Force authorities at Myrtle Beach AFB, South Carolina, where appellant was stationed.
By this time, Air Force investigators had learned enough about the circumstances of the propane fire to be skeptical of appellant’s claim that it was accidental. Mindful of Mrs. Willis’ safety, they assisted her in moving to Rhode Island, where she stayed with her *890 brother. Returning to Myrtle Beach AFB from the ARC, appellant was placed on restriction and forbidden to have further contact with his wife. On December 31, 1992, appellant was informed of the charges against him, that he had attempted to murder his wife on August 13, and had assaulted her on August 27.
Upset by this news, appellant telephoned Wilma Plybon, who lived in appellant’s home town of Ironton, Ohio. She confirmed that the Air Force was, indeed, serious about the charges, and then tragically related that both she and Mrs. Willis would be journeying to Myrtle Beach for preliminary investigative work by the government representatives to an Article 32 (10 U.S.C. § 832) pretrial investigation of the charges. She told him that she and Mrs. Willis were to be there on January 4,1993.
Appellant resolved at that point to murder both his wife and his Aunt Wilma, and began elaborate preparations to do so. Although restricted to base except under escort, he was able to purchase a 9mm handgun, take it to a range, rent two cars, and two different motel rooms.[2] In addition, he obtained a signature loan for $1500 from his credit union, which he claimed was for a motorcycle, cleaned out his bank account, “maxed” his credit cards, and pawned a number of his personal belongings, all of which were to provide him ready cash for his planned flight. He prepositioned one of the rental cars, packed with his belongings, at a motel, with a map marking his route to his intended destination of Brownsville, Texas. He cut a portion of the wire fence around the base at a remote location, pulled it back to accommodate a large vehicle, then marked the spot with a stake and a surveyor’s ribbon. He intended to appropriate a government four-wheel drive truck to drive over rough terrain to the concealed cut in the fence to avoid the necessity to exit the base through the gate after having committed the murders.
Thinking that he might be killed or captured, he even arranged to have a prostitute visit him at his motel room on January 2nd, because “I at least wanted to have sex at least once more in case I had to commit suicide.” On Sunday, January 3, he packaged up many of his belongings and either gave them away, or mailed them to his parents. That night, he again sneaked off base to a motel, using the yellow pages to call all local hotels and motels in an unsuccessful effort to find out where his wife was staying. He had already located his aunt’s quarters on base by the simple expedient of looking for a rental car with West Virginia plates. (The closest rental agency to Ironton, Ohio was in West Virginia.)
As luck would have it, appellant worked in the civil engineering (CE) complex, across the street from, and in sight of, the base legal office. He was able to see first his aunt and her husband, Terry Plybon, go into the legal office, and then his wife. He had already loaded the handgun, put extra rounds in the pockets of his battle dress uniform (BDU’s), and stuck the gun into his trousers where it was covered by the loose-fitting uniform shirt. He took the Air Force 4x4 truck from the CE complex, parked it in front of the legal office, and went inside.
He was not at first noticed, and looking for his wife, walked by the office of Captain (Capt) Hatch, one of two Air Force lawyers tasked with investigating his case. Inside, he spotted the Plybons. At this point, having failed to locate his wife, his resolve faltered, and he returned to the truck, driving slowly once around the block. Regrettably, his courage returned, and he entered the legal office a second time.
This time he was confronted by one of the paralegals, who asked appellant what he could do for him. Appellant responded that he wanted to talk to Capt Hatch. The paralegal went to Capt Hatch’s office, and told him that Senior Airman (SrA) Willis wanted to see him. Hatch told the paralegal to tell Willis that he (Willis) had no business there, that he should confer with his defense counsel. By this time, appellant was striding down the hall in the direction of the courtroom and deliberation room. Looking for his *891 wife in Hatch’s office, he stuck his head in, greeting his aunt “sarcastically.” He was stopped by the staff judge advocate (SJA), Lieutenant Colonel (Lt Col) (then Major) Acklin, who ordered him to leave the legal office. Appellant pretended to comply, and accompanied Acklin back toward the reception area, but abruptly turned on his heel and went straight back toward the deliberation room again. Ignoring a second order from Acklin to stop, appellant spotted his wife in the deliberation room. According to him:
There was my wife standing up. I started to walk into the door and then she said “Jeromy” and was beginning to say something when suddenly I withdrew my 9 mm from the front of my pants. When she saw the gun she said “oh my God” and became hysterical. I then aimed and shot her once in the chest then [without] aiming I pointed the gun towards her head, visualized it, and then shot her in the head. I was walking up closer to her to fire one more shot in her head (to make sure she was dead) and [Lt Col Acklin] came to the door to try to lock me in then I pointed the gun towards him (to scare him off I didn’t want to shoot at him) and he ran out of my sight. I then knew that it was only a matter of seconds before the military police arrived so I ran to the office where my aunt was and tried to get in but her husband was blocking the door with his foot. I pressed hard and the door opened about 6 inches. I became angry because I couldn’t get to my aunt so when the door opened 6 inches I saw Captain Hatch directly in front of the opening and I fired one round in his direction. After I fired that round my gun jammed. I backed off of the door and tried to unjam the gun [without] success. At the moment I knew that I had to settle for what was accomplished. I ran out of the legal office, got into the truck, and drove the route that I had planned.
Appellant took one of the rental cars and drove straight through to Brownsville, Texas, pausing along the way to switch license plates twice. Once there, he set about creating a new identity for himself, using obituaries and forging a Texas driver’s license in the name of a decedent having approximately the same birthday as he. After a featured vignette in the television program “America’s Most Wanted,” on January 20 he was captured by the FBI in Brownsville, who had traced his rental car when he left it in a parking lot before crossing the border into Mexico.
Once caught, he was advised of his rights and requested a lawyer. Nevertheless, he was subsequently interrogated by the Brownsville authorities, and a videotaped confession was produced. He was returned to military control, and was placed into confinement at the Charleston Navy brig.
Taking advantage of a serious lapse in security procedures, appellant escaped from the brig on June 6, 1993. He was again captured, this time in Ft. Worth, Texas, when a clerk in the Texas Department of Public Safety (DPS) became suspicious over his application for a driver’s license in the name of a recently-deceased individual. He was returned to the Charleston brig, where he wrote a 95-page handwritten statement which he intended for publication.
The government proceeded on a capital murder charge, in addition to the other charges above-mentioned. They specifically relied upon two aggravating factors to justify seeking the death penalty under Rule for Courts-Martial (R.C.M.) 1004(c), viz, that the murder was committed with intent to obstruct justice (R.C.M. 1004(c)(7)(H)), and/or that the murder was preceded by the intentional infliction of substantial physical harm or prolonged, substantial mental or physical pain and suffering to the victim. (R.C.M. 1004(c)(7)(D).
DISCUSSION

I. Article 32 Investigating Officer

In his first assignment of error, appellant asks us to order a new Article 32, UCMJ (10 U.S.C. § 832), pretrial investigation because the Article 32 investigating officer (IO) was not impartial, thereby depriving him of a substantial right. He points out that the IO was a staff judge advocate (SJA) for a wing which was a part of the 9th Air Force, and as such was under chain of com *892 mand of the convening authority in this case; and that he was acquainted with some of the witnesses, including Lt Col Acklin. As particular evidence of the influence of this alleged bias, appellant points to three decisions of the 10.
First, appellant complains that none of the 10 witnesses he requested at the initial Article 32 investigation held in March of 1993 were obtained by the 10. We agree that the IO’s wooden application of R.C.M. 405(g)(1)(A)’s 100 mile rule fails the test of reasonableness. United States v. Marrie, 39 M.J. 993 (A.F.C.M.R.1994), aff'd, 43 M.J. 35 (1995); United States v. Burtfitt, 43 M.J. 815 (A.F.Ct.Crim.App.1996). However, appellant glosses over the fact that there were no less than three different pretrial investigations, all undertaken by the same 10: the first in March of 1993; the second, held in July, coming as a result of appellant’s additional crimes attending his escape from the Charleston brig; and the third, held in October in satisfaction of the military judge’s order to the 10 to produce two of appellant’s requested witnesses, Lt Col Acklin and Ms. Lorna Rozelle, a trailer park resident and witness to the August 1992 assaults. Going well beyond the immediate edict of the military judge, the 10 in October interviewed all of appellant’s earlier-requested witnesses except for the Plybons, who, having been nearly murdered while preparing for the first pretrial investigation in January, unequivocally made themselves unavailable until trial. At that, appellant failed to ask for their deposition, nor did he ask that the trial be continued to enable further questioning of the Plybons. See United States v. Mickel, 9 U.S.C.M.A. 324, 26 C.M.R. 104, 107, 1958 WL 3310 (1958). There is no possibility of prejudice here, nor is appellant’s accusation of bias even remotely substantiated by the IO’s ultimately harmless error in applying the 100-mile rule.
Still less persuasive in concluding that the 10 was biased was his decision to consider the Plybons’ sworn statements. They had declined personal attendance at the pretrial investigation, and were not subject to compulsory process. The IO’s decision was, therefore, fully within the prescription of R.C.M. 405(g)(4)(B)(i). They did appear at trial, were subject to cross-examination, and were available to defense counsel at all pertinent times.
Finally, the IO’s reliance on the Brownsville videotape hardly betrays prejudice on his part. In the first place, defense counsel did not object to it at either of the first two Article 32 investigations, nor did they object to its consideration by the 10 at their subsequent motion in an Article 39a (10 U.S.C. § 839a) hearing before the military judge. They did object at the final Article 32 investigation. Whatever the merits of appellant’s argument that the Brownsville videotape was an “involuntary” statement, the 10 had abundant evidence independent of that tape, not the least of which was appellant’s 95-page handwritten statement prepared while at the Charleston brig for a Ft. Worth publisher. The 10, taking note of the objection, declared that, even without considering the Brownsville tape, his recommendations would have been the same. Consequently, there was no prejudice to the appellant, and appellant’s somewhat shrill ad hominem against the 10 must fail.

II. Providence of Pleas of Guilt to Attempted Murder of Terry Plybon and Assault on Police Officer

A. Attempted Murder of Terry Plybon

The testimony of both Terry and Wilma Plybon coincided with appellant’s own version of the events leading to the attempted murder charges. Frustrated by Mr. Plybon’s blocking of the door to Capt Hatch’s office, appellant aimed a shot at Capt Hatch (and believed he had hit him in the chest). As it happened, Capt Hatch dropped to the floor a split-second before appellant pulled the trigger, saving his own life. Next, appellant pushed his forearm around the door to where he knew the Plybons were cowering and squeezed the trigger — three times. At trial, appellant pled guilty to three specifications of attempted murder, one for each of the Plybons and one for Capt Hatch. He now avers that his plea to the attempted murder of Terry Plybon was improvident, since during the military judge’s inquiry into the providence of the plea he said, “If my nine millimeter had not jammed, I probably *893 would have shot her husband Terry Plybon as well. I didn’t have the intent but I did endanger him at that time.”
Appellate defense counsel seizes on United States v. Roa, 12 M.J. 210 (C.M.A.1982) to stand for the proposition that, where an accused fires a shot into a crowd intending to kill one person, but does not kill that person, he cannot be charged with attempts to murder the other persons in the crowd.[3] We agree that Roa is important to the disposition of this asserted error, and deserves further discussion.
Specialist Roa, having a grudge against military policemen in general, encouraged and supported another soldier in tossing a hand grenade into a military police station where four persons were present. The trial judge convicted him, contrary to his pleas, of four specifications of attempted murder. The Roa Court reversed, ruling that the military judge had relied on an erroneous standard of law in reaching his findings. Specifically, the Court ruled that in finding as he did, the military judge could not rely on a theory that the accused attempted to murder the stated victims by engaging in an inherently dangerous act, or evincing a wanton disregard for human life. Instead, there must be a finding of a specific intent to kill. The Court had no doubt that such a finding was sustainable under the facts of the Roa case:
In view of the high risk of homicide that accompanied such conduct and the inference that persons intend the natural and probable consequences of their acts, this evidence fully sufficed to sustain the judge’s findings that appellant was guilty of attempted murder.
Roa, 12 M.J. at 211 (emphasis added). There are striking factual parallels between this case and Roa. Appellant did not merely fire a single shot aiming at Wilma Plybon. He squeezed the trigger three times, aiming and, according to Mrs. Plybon, moving his pistol between shots, at the very small space behind the door occupied by both Plybons. This is factually more akin to the grenade than to a single shot.
From a legal standpoint, the case subjudice materially differs from Roa in that appellant, as part of his providence inquiry, quite explicitly acknowledged a specific intent to kill, in this case, both Capt Hatch and Wilma Plybon. The military judge therefore, not unreasonably found appellant’s plea with respect to Terry Plybon provident under the doctrine of transferred intent.
Counsel argues that the doctrine of transferred intent ought not to be applied under the facts of this case where, as here, neither the intended victim nor the “transferred intent” victim is actually shot.[4] Yet, the Manual for Courts-Martial, United States, Part IV, ¶ 43c(3)(a) (1984), discussing intent in murder prosecutions under Article 118, clearly indorses the theory, saying “the intent [to kill] need not be directed toward the person killed____”
Jurisdictions differ on this question. Compare Al-Qaadir v. Gallegos, 56 F.3d 70 (9th Cir.1995); State v. Rodriguez-Gonzales, 164 Ariz. 1, 790 P.2d 287, 288 (App.1990) (intent to murder is transferrable to each unintended victim once there is an attempt to kill someone); Brooks v. United States, 655 A.2d 844 (D.C.1995) (multiple shots into a crowd, where only one subject is actually object of intent to kill, sufficient to sustain multiple counts of attempted murder); People v. Hill, 276 Ill.App.3d 683, 213 Ill.Dec. 273, 658 N.E.2d 1294 (1995); People v. Burrage, 269 Ill.App.3d 67, 206 Ill.Dec. 450, 645 N.E.2d 455 (1994); Straub v. State, 567 N.E.2d 87 (Ind.1991); State v. Ford, 539 N.W.2d 214 (Minn.1995); State v. Abeyta, 120 N.M. 233, 901 P.2d 164 (1995); People v. Joseph, 207 A.D.2d 750, 616 N.Y.S.2d 733 (N.Y.App.Div.), pet. denied, 84 N.Y.2d 1012, 622 N.Y.S.2d 924, 647 N.E.2d 130 (1994); with People v. *894 Calderon, 232 Cal.App.3d 930, 283 Cal.Rptr. 833 (1991); State v. Hinton, 227 Conn. 301, 630 A.2d 593 (1993); Ford v. State, 330 Md. 682, 625 A.2d 984 (1993).
The preceding citations suggest non-empirically the majority view favors applicability of the doctrine of transferred intent in attempted murder cases. But we need not decide this issue on what other jurisdictions may have decided, nor do we need to grapple with the public policy considerations appellant offers. Instead, we find compelling Chief Judge Everett’s conclusion in Roa that, as a factual matter, tossing a grenade into a crowded room, knowing the complete lethality of an operable grenade, was sufficient to infer an intent to kill, notwithstanding that nobody was, in fact, killed. In this case, appellant pulled the trigger three times at nearly point-blank range. The pistol was unaimed, in the sense that he could not see to distinguish which of the two people he knew to be there would be struck. He moved the pistol between each attempted shot, with the evident idea of covering the small area occupied by the Plybons.
The Roa adoption of the doctrine of transferred intent only makes sense. As a theoretical proposition, there ought to be a difference in the criminal liability between the individual who, intending to kill policeman A, tosses a grenade into a crowded room in which he sits, but the grenade fails, and the case where he fires a single (unsuccessful) shot into the room, intending to kill only policeman A. The former indicates a perfect willingness to commit multiple homicides to achieve the intent of killing only one individual; the latter case does not. The former is obviously the more serious crime, and it is the one into which appellant most closely fits. His plea of guilty, on advice of counsel, to attempting to kill both Plybons is not, therefore, improvident.

B. Providence of Plea to Resisting Arrest

Following his escape from the Charleston brig, appellant returned to Texas where he again attempted to establish a new identity. As he had earlier at Brownsville, he scanned the newspaper obituaries to identify a recently deceased man of about his age, then found out the necessary particulars from the obituary. With this information, and a paper copy of a Texas driver’s license which he altered to reflect the selected name and his own physical characteristics, he was able to send away for a copy of the birth certificate. With the birth certificate, he would get an authentic driver’s license, using the story that he had lost his. However, while he was at the Texas Department of Public Safety, an alert clerk ascertained that the individual who claimed to be in front of her was dead. She alerted Officer Hobbs, who, although off-duty, was still in uniform. He took the birth certificate presented by appellant. Appellant, worried for obvious reasons, snatched the birth certificate and ran away, pushed an elderly lady out of his way, and deliberately ran across a crowded, dangerous highway, stepping in front of a truck with the knowledge that Officer Hobbs was directly behind him.
The statement of Officer Hobbs included as part of the pretrial investigation was that the appellant led him a merry chase across busy streets through shopping centers, apartment complexes, and over fences. Twice Officer Hobbs caught the appellant, who kicked and pummeled his way free. During the Care[5] R.C.M. 910 inquiry, however, appellant failed to mention the actual physical encounters with Officer Hobbs, and the government made no effort to introduce Officer Hobbs’ testimony. Appellant now avers that his plea was improvident as to that offense, citing United States v. Burgess, 32 M.J. 446 (C.M.A.1991) (mere flight insufficient to sustain charge of resisting apprehension). The government counters with United States v. Malone, 34 M.J. 213 (C.M.A.1992) (flight coupled with endangering others sufficient).
Even considering no more than appellant’s somewhat antiseptic account of his flight from Officer Hobbs, we think this case more closely aligns with the Malone situation, an opinion indorsed by appellant’s trial defense counsel. When the Burgess — Malone distinction was brought to the attention of the court by an alert prosecutor, the military *895 judge referred back to the deliberate use of a speeding truck to avoid apprehension and the snatching of the birth certificate. At this point, appellant’s defense counsel specifically conceded the issue, declaring, “we would also agree that the military judge has inquired and has established at this point far more than mere flight.” Whether the inquiry could have or should have proceeded farther at this point, or whether the government might have been well-advised to have attempted to flesh out appellant’s version of events is, in our view, less important than the principle that the appellant ought to be bound by his own account of the facts, and his counsel’s tactical concession on a point of law. United States v. Clark, 28 M.J. 401 (C.M.A.1989). We are disinclined, at this point, to entertain a Catch 22 of appellant’s own making, and wholly concur with the conclusion at trial — a conclusion shared by appellant, the military judge, and appellant’s counsel — that “far more” than mere flight was established.

III. Multiplicity of Desertion and Escape from. Confinement

Appellant next asks that we dismiss the finding of guilty with respect to the specification alleging escape from confinement, arguing that it is multiplicious with desertion. Appellant’s failure to raise this issue at trial, indeed, his provident pleas of guilty to both offenses, are dispositive against him. United States v. Lloyd, 43 M.J. 886 (A.F.Ct.Crim.App.1995).
Even were the issue not waived, we have no difficulty concluding under the most elastic reading of the governing cases, that the offenses of escape from confinement and desertion (which begins with that escape) are discrete. Escape from confinement is prohibited by Article 95 of the UCMJ (10 U.S.C. § 895), while desertion is covered by Article 85 (10 U.S.C. § 885). Unmistakably, Congress meant to, and did, identify two discrete punishable offenses. United States v. Teters, 37 M.J. 370 (C.M.A.1993), cert, denied, — U.S. -, 114 S.Ct. 919, 127 L.Ed.2d 213 (1994). Teters, following Blockbwrger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), ties the theoretical analysis of multiplicity to the double jeopardy clause of the Fifth Amendment of the Constitution. The government cannot convict an accused at a single trial of more than one offense for the same course of conduct, contrary to the intent of Congress. Teters, 37 M.J. at 373.
But escape from the brig, followed by a prolonged absence with the intent to remain away permanently, are neither the same act, nor are they the same course of conduct, nor do they derive from the same statute. Appellant’s argument that escape from confinement is no more than a specialized “failure to go” is unpersuasive, and adopting it would render nugatory 10 U.S.C. § 895. The only “overlap” between the two offenses is that the onset of the desertion began with appellant’s escape from the Navy brig at Charleston. To complete the desertion offense required the formation of the intent to remain away permanently — an element which forms no part of the escape offense. Further, desertion requires an accused to “remain” absent, which also lacks any parallel in an escape from confinement. Accordingly, we reject this assignment of error.

IV. Excluded Evidence Provided Members on Findings

While awaiting trial, appellant wrote a 95-page account of the murder and the events surrounding it, apparently with a view toward publication. Pages 1 through 89 of that narrative were admitted during the findings portion of the trial by the military judge as Prosecution Exhibit 65. The last six pages were excluded by the military judge, chiefly because this portion disclosed the appellant’s defense counsel’s assessment that the government had a very strong case to prove premeditation. In addition, those pages referred to the subsequently excluded Brownsville videotape. The excluded six pages were marked as Appellate Exhibit CVIII. Subsequently, they were admitted during the sentencing phase as Prosecution Exhibit 85.
For reasons that will likely forever remain obscure, those six pages were included as part of Prosecution Exhibit 65 in the original and two copies of the record of trial. Appellant argues that the “presumption of regularity” conclusively establishes that the voting members were given the excluded six pages during the findings portions.
*896 We are convinced otherwise. In the first place, the trial counsel has provided an affidavit asserting he distinctly recalls removing the six pages attendant to the ruling of the military judge. He is unequivocal, writing “there is absolutely no doubt in my mind that those pages were removed and that they were not given to the Court Members during the findings portion of the trial.” In another affidavit, the court reporter who prepared the record of trial is likewise certain that the six pages did not get to the members on findings.
These affidavits are corroborated by the transcript of the proceedings itself, where trial counsel resurrected the six pages during the sentencing portion. The military judge admitted them over vigorous objection. Trial counsel expressed some uncertainty as to how appropriately to mark the pages, and stated he assumed they would be reattached to Prosecution Exhibit 65. The military judge, disagreeing, ordered that they be marked as Prosecution Exhibit 85, whereupon trial counsel retrieved the six pages from the bench with the expressed purpose of marking them as the military judge had directed. When the members were recalled, the trial counsel handed each of them a copy of Prosecution Exhibit 85, explaining while doing so that he was giving them “six pages of what has been previously introduced as Prosecution Exhibit 65, the accused’s statement.” No member remarked upon the anomaly, which should have become glaringly apparent, of receiving a “new” exhibit containing pages which were already included in a preceding exhibit, and which, under appellant’s theory, they would have already received and considered. We are convinced that they did not so remark because it was the first time they had seen those six pages. Article 66(c), UCMJ (10 U.S.C. § 866(c)).

V. Appellant’s Due Process Rights Violated by Introduction of Unfairly Prejudicial Evidence

Appellate defense counsel next levels a personal attack against the prosecutors, accusing them of violating appellant’s due process rights by: (A) intentionally seeking to inflame the members’ passion through introduction of a cumulative, irrelevant, bloodied piece of carpet bearing imprints of Mary Ann Willis’ face; (B) cross-examining the defense expert, Dr. Waid, with information derived from appellant’s involuntary confession; and (C) impermissibly rebutting as fact appellant’s unsworn sentiment that he was sorry.

A Bloody Carpet Swatch

We begin with the observation that argument is seldom if ever advanced, and more often impaired, by resort to the ad hominem. Having reviewed the 28 volume record, we are impressed with the professionalism and courtesy of counsel for both sides, who at once displayed skill and ardor in furtherance of their clients’ interests.
No value is added to appellant’s evidentiary objections by impugning the motivations of counsel, nor does doing so create a constitutional issue where none exists. Evidentiary decisions are, in the main, reviewed on an abuse of discretion standard, and attributing sinister motivations to the proponent of evidence does not change that. See United States v. Jenkins, 27 M.J. 209 (C.M.A.1988). That aside, the admission of the bloody swatch of carpet and the autopsy photographs troubles us, even allowing for the broad discretion afforded the military judge in such matters.
Appellant attempted to plead guilty to premeditated murder, but was unable to do so because the government was seeking the death penalty. See Art 45(b), UCMJ (10 U.S.C. § 845(b)); R.C.M. 910(a), 1004(a)(1). Instead, he pled guilty to unpremeditated murder. The military judge, following a providence inquiry, accepted his plea without entering findings. R.C.M. 910(g)(2). He advised the members during voir dire that the appellant had pled guilty to unpremeditated murder, and during instructions on findings, reminded them of that fact, and that the appellant, by virtue of his plea, had conceded all elements of the offense of murder except that of premeditation. Nevertheless, the prosecution attempted to introduce post-mortem photographs of Mary Ann Willis and a swatch of carpet taken from the Myrtle Beach legal office bearing the bloody imprint of her face and lipstick, wrought by the impact of her face when she fell to the floor following the shot to the head.
*897 Trial defense counsel promptly and vociferously objected, arguing that appellant’s plea of guilty to unpremeditated murder conceded that he had killed her, that he intended to do so, that the killing was unlawful, and that he had done so in the Myrtle Beach legal office, with two shots, the first to the body, the second to the head, from a 9mm pistol. Defense counsel concluded that the autopsy photographs showing bullet entrance and exit wounds, and the carpet swatch were not, therefore, logically relevant to the only issue before the members at that time— premeditation. Mil. R. Evid. 401, 402. See, e.g., United States v. Huet-Vaughn, 43 M.J. 105 (1995), cert, denied, — U.S.-, 116 S.Ct. 922, 133 L.Ed.2d 851 (1996).
Rule 401 defines relevant evidence in terms of logic, that is, whether the evidence has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable. Rule 402 codifies the corollary to Rule 401, namely, that irrelevant evidence is not admissible. Rule 403 then supplies the rationale for the exclusion of relevant evidence if its probative value is outweighed by the danger of unfair prejudice, confusion, and so forth.
As a logical syllogism, it is unnecessary to undertake a Rule 403 analysis if, in the first instance, evidence is irrelevant. During the findings portion of this case, the principal issue in dispute with respect to the murder charge was that of premeditation. The government’s chief witness through which this evidence was introduced, Dr. Proctor, conceded during an Article 39(a) session that the autopsy photos and the carpet swatch were unhelpful in this respect. Appellant argues that such grisly evidence has the potential to so inflame members that they might be influenced to vote on the issue of premeditation based upon the vulgarity of the murder itself, and that is what was intended by the prosecution.
We understand that an accused cannot disinfect the circumstances of his crime, no matter how heinous, through artful pleading. The Discussion of R.C.M. 910(a)(1) in the Manual for Courts-Martial states that “[a] plea of guilty does not prevent the introduction of evidence, either in support of the factual basis for the plea, or, after findings are entered, in aggravation.” Neither do we retreat in the slightest from our earlier holdings respecting such photographs or gruesome evidence, providing they are offered for a legitimate evidentiary purpose at the correct point in the trial. United States v. Mobley, 28 M.J. 1024, 1029 (A.F.C.M.R.1989), set aside on other grounds, 31 M.J. 273 (C.M.A.1990)[6]; see also United States v. Combs, 35 M.J. 820 (A.F.C.M.R.1992), aff'd, 39 M.J. 288 (C.M.A.1994).
Combs stands for the proposition that either side is entitled to present “certain basic information about the victim ... to help the court formulate an accurate mental picture of the circumstances of the case.” Combs, 35 M.J. at 823. But Combs, like Mobley, did not involve a guilty plea which admitted to all the facts and circumstances of the crime amenable to proof by physical or demonstrative evidence. Cf. United States v. Mohel, 604 F.2d 748 (2d Cir.1979) (reversal where defense counsel’s stipulation refused).
The relevance of the photographs and the carpet, if any, had largely dissolved by the time the military judge accepted the plea. During sentencing, that relevancy was restored to show the facts and circumstances of the crime. R.C.M. 1001(b)(4). At that point, the military judge could have, as he did during the findings portion, weighed the evidence under Rule 403. But the judge erred in his Rule 403 balancing analysis when he admitted them during the findings phase given their potentially inflammatory impact when weighed against their attenuated relevance to any issue then before the members.
*898 Despite this error, we are convinced that appellant was not prejudiced. The evidence of premeditation could scarcely have been more conclusive. Without being exhaustive, that evidence included elaborate preparations over a four-day period: liquidating his assets and borrowing money for his escape; renting two different cars and motel rooms; marking out his escape route and cutting through the base perimeter fence to permit a rapid exit; contacting local motels to find his wife; locating Wilma Plybon’s quarters; surveillance of the legal office; purchase and test-firing of a 9mm handgun. All of this came from appellant’s own, lawfully admitted statement.[7] Still, at least one member was not convinced beyond a reasonable doubt, precluding thereby consideration of the death penalty. R.C.M. 1004(a)(2).

B. Cross-examination of Dr. Waid,

Further to his due process argument, appellant contends that the military judge erred in permitting the prosecution to cross-examine Dr. Waid, a defense witness who was put on to opine that the appellant did not have the “cool mind” requisite to premeditation, and that his motivation for the murder was vengeance, not obstruction of justice. Dr. Waid, at the defense’s behest, had viewed the Brownsville videotaped confession, in which appellant had expressed his intent to make his wife suffer before she died, and which contained his declaration that in furtherance of this objective he deliberately shot her first with what he thought to be a nonlethal wound to the chest. Dr. Waid acknowledged that the tape in part informed his conclusions. The prosecution advised the court and counsel for the appellant of its intention to cross-examine on this score, and the defense, thus alerted, advisedly waived any objection.
Otherwise inadmissible statements by an accused may become the subject of cross-examination where they form the basis for an expert opinion advanced by a defense expert. United States v. Mansfield, 38 M.J. 415, 418 (C.M.A.1993), cert, denied, — U.S.-, 114 S.Ct. 1610, 128 L.Ed.2d 338 (1994); see also Mil. R. Evid. 705. However, Mansfield dealt with a statement by the accused which was privileged, not one subject to a constitutionally-required exclusionary rule. James v. Illinois, 493 U.S. 307, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990) draws a distinction on that basis, concluding, in a 5-4 opinion, that the purposes of the exclusionary rule are not adequately served when the government is permitted to bring in through cross-examination of a defense witness that which was excluded.
Whether Rule 705 furnishes a rationale by which to distinguish James need not be decided, because in James, the evidence was admitted over defense objection, thus preserving the error. Here, it was not. Indeed, an objection was expressly waived. The admission, under the circumstance of an express waiver by counsel, does not constitute plain error, and even if it did, it would be harmless beyond all doubt.[8] United States v. Strachan, 35 M.J. 362, 364 (C.M.A.1992), cert, denied, 507 U.S. 990, 113 S.Ct. 1595, 123 L.Ed.2d 159 (1993); United States v. Pagel, 40 M.J. 771, 776 (A.F.C.M.R.1994).

C. Rebuttal of Appellant’s Unsworn Statement

In his portion of the presentencing case, appellant introduced copies of letters which (within days of his trial) he had sent to Mary Ann Willis’ surviving family, including her young son, in which he expressed pro *899 found remorse for the murder. Near the end of his unsworn statement he declared, “I am truly sorry. I know ... I hope that it does help to know that I do say it and that I am sincerely sorry.” The government counter-punched by introducing two inconsistent statements by appellant. The first was in response to a questionnaire given by Dr. Waid in which appellant completed the sentence, “When I think about illegal things I have done, I am ...” with “not sorry or never think about it.” The government also offered a truly chilling audio tape of a message appellant left on Mrs. Willis’ brother’s answering machine while appellant was eluding capture, which, far from expressing remorse, was a gloating, sardonic expression of triumph over his crime.
We agree with the military judge in concluding that the appellant’s expressions of remorse constituted a statement of fact. Either he was sorry or he wasn’t. Appellant didn’t say, “I think I’m sorry.” Nor, if he had, would it have made other than a semantic difference, sorrow being a non-empirical, subjective state of mind to begin with. He endeavored to paint a picture of penitent contrition, a picture the government was at liberty to deface with contrary evidence in the form of appellant’s clearly contradictory statements and actions. See United States v. Reveles, 41 M.J. 388, 392 (1995); United States v. Cannon, 33 M.J. 376, 382 (C.M.A. 1991); United States v. Britt, 16 M.J. 971, 972-973 (A.F.C.M.R.1983).

VI. Mandatory Life Sentence Unconstitutional

The statutory minimum sentence upon conviction of premeditated murder is life imprisonment. Article 118, UCMJ (10 U.S.C. § 918). Article 55, UCMJ, (10 U.S.C. § 855) prohibits cruel and unusual punishment. In Harmelin v. Michigan, 501 U.S. 957, 994, 111 S.Ct. 2680, 2701, 115 L.Ed.2d 836 (1991), Justice Scalia wrote, “severe mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation’s history.” Appellant fastens on this excerpt from Harmelin, which approved a mandatory life sentence in Michigan for certain drug offenses, to point out that, while the Eighth Amendment is phrased in the conjunctive (“cruel and unusual punishment”) a portion of Article 55 is worded in the alternative (“Punishment by flogging, or by branding, marking, or tattooing on the body, or any other cruel or unusual punishment, may not be adjudged----”). Appellant reasons, unlike the Eighth Amendment, under Article 55 if a punishment is either cruel or unusual, it is prohibited, thus elevating Justice Scalia’s off-hand dictum to a pronouncement that mandatory penalties are cruel.
We are reluctant to attribute so irrational a result to the wording of the statute, particularly where it is entitled, “Cruel and unusual punishments prohibited.” The first rule of statutory construction, that statutes in pari materia are to be construed so as to be in harmony with each other, aids us in concluding Congress was unlikely simultaneously to establish and nullify a minimum sentence in a single enactment. And it is clear that such mandatory minimum penalties pass constitutional muster. Harmelin; see also Chapman v. United States, 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991); Hutto v. Davis, 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982). In fact, as a constitutional matter, the Supreme Court has properly given broad deference to legislative judgments respecting crime and punishment. See, e.g., Bennis v. Michigan, — U.S.-, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996).
Nor do we think Congress intended to enlarge the sweep of the Eighth Amendment when it enacted Article 55, as it did with Article 31 (10 U.S.C. § 831). The abbreviated legislative history on that score simply does not support such an ambitious conclusion, but suggests that Congress was doing no more than accommodating the concern that the Bill of Rights might not apply to the military. 2 U.S. Army Court of Military Review, An Authoritative Index and Legislative History of the Uniform Code of Military Justice, 1950, at 1578, 1940 (United States Army Legal Services Agency 1985). Furthermore, unlike most criminal jurisprudence, under the UCMJ the pronouncements of the trial court respecting sentence are not final. The convening au *900 thority is free to disapprove all or any portion of a sentence and this Court may decide that, while legal, a sentence is nevertheless inappropriate. 10 U.S.C. §§ 860, 866. Consequently, we reject this assignment of error.

VII. Sentence Appropriateness

We shall not tarry on this assignment of error. Appellant coolly, viciously, and without twinge of conscience murdered a young woman to whom he had professed undying love only months before. He did so for no other reason than that she had been intolerant of his earlier attempt to incinerate her with propane. According to his own statement, his murderous intent was limited only by his supply of bullets, the serendipitous malfunction of his gun, and the necessity that he escape the legal office before the police arrived. The string of crimes he committed before and after the murder, serious in and of themselves, still pale in comparison to the cruel ferocity of his actions on January 4. Accordingly, we have no difficulty deciding that his sentence is appropriate.
CONCLUSION
Finding the assignments of error to be without merit, the findings and sentence are otherwise supported in law and in fact, the sentence is appropriate, and the same are hereby
AFFIRMED.
PEARSON and SCHREIER, Senior Judges, concur.

. In addition to the premeditated murder charge under Article 118, Uniform Code of Military Justice (UCMJ) (10 U.S.C. § 918), pursuant to mixed pleas, appellant was found guilty of two specifications of assault, one of which was with a means likely to produce grievous harm in violation of Article 128, UCMJ (10 U.S.C. § 928); three specifications of attempted murder in violation of Article 80, UCMJ (10 U.S.C. § 880); wrongful appropriation of a government vehicle in violation of Article 121, UCMJ (10 U.S.C. § 921); desertion from A — 20 January 1993 in violation of Article 85, UCMJ (10 U.S.C. § 885); two specifications of violating a lawful order in violation of Article 90, UCMJ (10 U.S.C. § 890); carrying a concealed weapon and breaking restriction in violation of Article 134, UCMJ (10 U.S.C. § 934); a second desertion charge from 6 June — 14 July 1993; escape from the Charleston brig and resisting apprehension in violation of Article 95, UCMJ (10 U.S.C. § 895). He was acquitted of attempted murder by setting fire to his wife on August 13, 1992, two specifications of obstruction of justice, and communicating a threat to kill his wife to his aunt, Wilma Plybon.

. Appellant later explained that he thought renting two motel rooms, at different locations, and two different cars, all of which he intentionally placed on his credit cards, would diffuse his trail and mislead investigators as to his direction of flight.

. In their brief, appellate defense counsel appear to cite this proposition as a holding of Roa. It is anything but. It was, instead, an example advanced by appellate defense counsel in the Roa case of an "anomalous result” that would ensue if the Court of Military Appeals had accepted the government's argument in that case.

. Appellate government counsel concedes error on this point — a concession we need not, and do not accept.

. United States v. Care, 18 U.S.C.M.A. 535, 40 C.M.R. 247, 1969 WL 6059 (1969).

. "Prosecutors traditionally attempt to aggravate criminal misconduct by showing slides, movies and still photographs of the victim. Recent military authority indicates that once trial counsel demonstrates relevant photos they are generally admissible. Evidence that might otherwise be admitted may become irrelevant if the defense admits all facts that the evidence is offered to prove. If an issue is undisputed, it is difficult to see how evidence tending to prove it can be relevant under Rule 401.” Stephen A. Saltzburg. Lee D. Schinasi, David A. Schlueter, Military Rules of Evidence Manual 438 (3rd ed.1991) (footnote omitted).

. "After [Wilma Plybon disclosed she and Mary Ann were coming to Myrtle Beach to testify] I decided to avenge myself.... I began to plan out what I was going to do and how I was going to get away.... I still had my 9mm concealed and I had a chance to kill my aunt right there but I didn’t want everyone to panic and my wife to hide and then I couldn't find her. My main objective was my wife first, then, if possible — my aunt....”

. Had the trial proceeded to consideration of the death penalty, this would not have been’easy. The government was required to prove, in support of the death penalty, either or both of two aggravating factors under R.C.M. 1004(c)(2). They elected to proceed using factors (H) (committed with intent to obstruct justice) and (I) (murder preceded by intentional infliction of substantial physical harm or prolonged, substantial mental or physical pain and suffering to the victim). Without venturing an opinion as to its persuasiveness, obviously, the appellant’s statement that he meant to wound his wife before killing her goes directly to the latter.