UNITED STATES, Appellee,

v.

Inmate Robert SMITH (a.k.a. Jeromy J. Willis), United States Disciplinary Barracks, Appellant.

ARMY 9900756.

U.S. Army Court of Criminal Appeals.

29 Nov. 2001.

For Appellant: Lieutenant Colonel David A. Mayfield, JA; Captain David S. Hurt, JA; Captain Daniel E. Goldman, JA (on brief); Colonel Adele H. Odegard, JA; Major Jonathan F. Potter, JA; Captain Kevin J. Mikolashek, JA.

For Appellee: Major Daniel G. Brookhart, JA; Captain Steven D. Bryant, JA (on brief).

Before CANNER, CARTER, and HARVEY, Appellate Military Judges.

## OPINION OF THE COURT

CARTER, Judge:

A military judge convicted appellant, pursuant to his pleas, of attempted wrongful appropriation of a motor vehicle, conspiracy to escape from post-trial confinement, escape from post-trial confinement, and fleeing apprehension, in violation of Articles 80, 81, and 95, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 881, and 895 [hereinafter UCMJ]. A general court-martial composed of officer members sentenced appellant to confinement for nine years. The convening authority approved the adjudged sentence.

Appellant was one of two inmates who escaped from the United States Disciplinary Barracks (USDB) on 30 April 1998 by hiding in a trash dumpster, which was then loaded onto a disposal truck and transported out of the USDB. After appellant's recapture, the

USDB convened an Unscheduled Reclassification Board (URB) to consider changing appellant's level of custody from medium custody to maximum security. In this Article 66, UCMJ, 10 U.S.C. § 866, appeal, appellant asserts that the military judge erred when he permitted the court-martial members to consider, during the sentencing phase of the trial, appellant's statement to the reclassification board that he believes, "It's an inmate's duty to try and escape, especially long-termers," and that he "is an escape risk and always will be," because the statement was obtained without an Article 31, UCMJ, 10 U.S.C. § 831, rights advisement. Appellant also asserts that his sentence is inappropriately severe in comparison to that of Inmate Taylor, who escaped with appellant. For the reasons stated herein, we find no merit to either of appellant's assignments of error.

## Background

Appellant has a long history of violent and antisocial behavior. On 13 August 1992, appellant's wife of four months announced her intent to divorce appellant. Appellant, then a Senior Airman named Jeromy J. Willis,[1] forced his wife into a closet in their mobile home, turned on a propane tank, and lit a match, resulting in second degree burns to the front of his wife's legs. Appellant persuaded his wife to report the burns as an accident. After appellant's wife was released from the hospital a few weeks later, she reaffirmed her intent to leave him. Appellant responded by attempting to choke her, as witnessed by neighbors.

Charges were subsequently preferred against appellant for the attempted murder and assault of his wife. On the day of the Article 32, UCMJ, hearing, appellant entered the base legal office building and shot and killed his wife (a scheduled witness), and attempted to shoot his aunt (another scheduled witness), his uncle, and the Chief of Military Justice.

On 13 December 1993, appellant was convicted of premeditated murder, attempted murder (three specifications), desertion (two specifications), disobeying a superior commissioned officer (two specifications), escape from confinement at the Charlestown Naval Brig on 6 June 1993, resisting apprehension, wrongful appropriation, assault, aggravated assault, carrying a concealed weapon, and breaking restriction. His approved sentence was life imprisonment, a dishonorable discharge, reduction to the lowest enlisted grade, and forfeiture of all pay and allowances. He was confined at the USDB to serve his life sentence, and his conviction was affirmed on appeal. *See United States v. Willis*, 43 M.J. 889 (A.F.Ct.Crim.App.1996), *aff'd, United States v. Willis*, 46 M.J. 258 (1997). Appellant's dishonorable discharge from the Air Force was executed on 17 February 1998.

## Statement to Unscheduled Reclassification Board

### Findings of Fact

Pursuant to Article 66(c), UCMJ, we make the following findings of fact:[2]

1. Appellant was a prisoner in medium custody when he escaped from the USDB on 30 April 1998. While being recaptured that same day, appellant was shot twice, and was subsequently admitted to the prison ward of the Fort Leavenworth, Kansas, hospital, for medical treatment.

2. Chapter 11 of USDB Regulation 15–1 explains the purpose of, and establishes procedures for, a URB:

> The USDB convenes a board of classification officials to consider an inmate for reclassification based upon new information concerning the internal risk to the institution or external risk to the community and public safety. The outcome of the unscheduled reclassification may be a custody elevation or reduction....

> ....

---

1. On 30 June 1998, the District Court of Leavenworth County, Kansas, granted appellant's request to legally change his name from Jeromy Willis to Robert Smith.

2. While we are in general agreement with the military judge's findings of fact, we have elected to substitute our own more extensive findings of fact. UCMJ art. 66(c); *see also United States v. Morris*, 44 M.J. 841, 843 (Army Ct.Crim.App. 1996), *aff'd*, 49 M.J. 227 (1998).

... The reclassification is an administrative measure used to examine risk as presented by an inmate's behavioral characteristics and adjustment to the institution and/or to assess new information about the inmate that was not available during initial classification or other reclassification decisions. The purpose of the board is to assist the Commandant in managing risk and maintaining good order and discipline in the institution. This includes the protection of cadre, staff, inmates, and the community employing the least restrictive means necessary.

USDB Reg. 15–1, Directorate of Classification (DCL), paras. 11–1 & 11–3 (1 June 1990) (C1, 3 Dec. 1997) [hereinafter USDB Reg. 15–1].

USDB Reg. 15–1 also requires that an inmate be informed in writing of the reasons for the URB, and that he "may present oral and/or written explanation as to why his custody level should or should not be changed." USDB Reg. 15–1, paras. 11–5a(2) & 11–5a(2)(d). The regulation further requires that the inmate be informed at the hearing that he does not have to answer any questions and that he will be allowed to affirm or rebut, orally or in writing, any information presented by the board. USDB Reg. 15–1, paras. 11–5b(2) and (3). Finally, USDB Reg. 15–1 states that the URB will be composed of staff members from the Directorate of Inmate Administration, the Directorate of Treatment Programs, and the Directorate of Operations. USDB Reg. 15–1, para. 11–4.

3. Escape, to include departing the USDB without proper authority, is a Category IV offense in violation of the USDB's Manual for the Guidance of Inmates. *See* USDB Reg. 600–1, Manual for the Guidance of Inmates, para. 10–1b(20) (1 May 1995).

4. A memorandum dated 6 May 1998 advised appellant:

1. Your custody level is being reviewed as an Unscheduled Reclassification Action.

2. You are scheduled to appear before a[n] Unscheduled Reclassification Board during the day of 11 May 1998 at your place of hospitalization.

3. Your Unscheduled Reclassification Board is based on the following:

Your 10 Discipline and Adjustment Boards,[3] 1 File Unfavorable and your escape from the U.S. Disciplinary Barracks on 30 April 1998. Your [failure] to obey the rules and regulations is inconsistent with maintaining good order and discipline of the USDB.

4. You will be allowed to affirm or rebut information presented by the board, orally or through written presentation. You do not have to answer questions presented to you by the board.

The notification letter also advised appellant of his right to call or cross-examine witnesses and to appeal any adverse decision within seventy-two hours of notification. Appellant was also provided with a copy of the information on which the URB was based.

5. The URB convened in appellant's hospital room on 11 May 1998. The board consisted of Lieutenant Colonel (LTC) Doll (a military police officer assigned as the Director of Operations for the USDB and also as the Correctional Holding Detachment Commander of the USDB), LTC Schmitt (the Director of Treatment Programs), and Dr. Leeson (the Director of Inmate Administration). At the time of the URB, appellant was being guarded and restrained in his hospital bed in the normal manner for medium custody post-trial prisoners in the prison ward of the Munson Army Hospital, which is located on Fort Leavenworth but outside the walls of the USDB.

Lieutenant Colonel Doll, the URB president, orally advised appellant, as he had previously been advised in his 6 May 1998 notification letter, that the purpose of the board was to reevaluate his custody level as a result of his recent escape and his prior inmate disciplinary record. She then reminded ap-

---

**3.** Discipline and Adjustment boards adjudicate alleged prisoner violations of prison rules and may impose a variety of punishments, including warnings, deprivation of privileges, extra duty, forfeiture of good conduct time, disciplinary seg- regation, and certain changes in custody grade. *See* Army Reg. 190–47, Military Police: The Army Corrections System, para. 12–11 (15 Aug. 1996).

pellant that he was not required to make any statement. Lieutenant Colonel Doll did not advise appellant that any statement made by him may be used as evidence against him in a trial by court-martial, or that he could consult with counsel prior to the URB or have counsel present during the URB. *See* Article 31(b), UCMJ; Military Rule of Evidence [hereinafter Mil. R. Evid.] 305(c)(3) and (d). Lieutenant Colonel Doll then asked appellant words to the effect of, "[W]ould you like to make a statement?" or "Do you have anything you'd like to say?" The URB report summarized appellant's response as follows:

> Inmate Willis stated he had nothing to say, but proceeded to tell the board, "(he) tried to escape and that's it." He brought up his Custody Reduction Board from last year and stated he beat the reduction. The board explained to him, this board (Unscheduled Reclassification Board) was entirely separate from that board of last year. Inmate Willis stated to the board, "it is an Inmate's duty to escape, or at least try, especially long termers like (himself)". They owe it to themselves to try to escape and override society. Until reality set in and he got shot, this is how he felt. He further stated he is an escape risk and always will be. He feels that without the escape charges, he would again beat a reduction in his custody. However, with the escape charges, he knows he will be reduced to Maximum custody, as escape is a, "big taboo."

There are five levels of custody in the USDB: maximum security, medium custody, medium inside only custody, minimum custody, and the trustee unit. The URB recommended a change in appellant's custody level from medium custody to maximum security, the most restrictive and tightest level of inmate security.

6. Appellant's URB was conducted in accordance with established USDB procedures and was consistent with the prison's operational and security requirements. At the time of his URB, appellant had been confined in the USDB for approximately four and one-half years. During that period, he participated in numerous other USDB administrative proceedings that affected the conditions and terms under which he served his confinement. Appellant is a high school graduate and has an associate's degree in science from the Air Force Community College.

7. Lieutenant Colonel Doll, in her primary duty as the USDB Operations Officer, routinely serves as President for URBs. She had previously conducted approximately thirty URBs at the USDB. The USDB Military Police Investigations (MPI) section works for LTC Doll in her capacity as the Operations Officer. She directed MPI to conduct an investigation into appellant's escape to assist her in preparing an after action report to explain what happened, why it happened, and to fix any security problems associated with the escape. This MPI investigation was still ongoing on 11 May 1998 when appellant's URB was conducted. On 29 December 1998, LTC Doll, in her capacity as the Commander, USDB Correctional Holding Detachment, preferred the charges that resulted in this court-martial. On 4 January 1999, LTC Doll forwarded appellant's charges to the Commander, USDB, with a recommendation for trial by general court-martial.

8. During appellant's court-martial, the government did not seek to admit the URB's written summary of appellant's response (see paragraph 5 above), but did call the URB recorder as an aggravation witness during the sentencing phase of the trial. The recorder testified that appellant told the URB, "It's an inmate's duty to try and escape, especially long-termers," and that he "is an escape risk and always will be." On cross-examination, the recorder admitted appellant also said that he believed this until he got shot and reality set in.

*Discussion*

Prior to appellant's plea of guilty, the military judge denied appellant's motion to suppress his statement to the URB, concluding that Article 31, UCMJ, was not violated because LTC Doll's single question to appellant, "Would you like to make a statement," did not amount to an interrogation, and that appellant's statement was not involuntary.

On appeal,[4] appellant argues that the military judge's focus on the term "interrogation" interpreted Article 31(b), UCMJ, too narrowly because LTC Doll's question to appellant during the URB was a "request [for a] statement from" appellant, in violation of Article 31(b), UCMJ.[5]

Our superior court has consistently rejected appellant's literal interpretation as inconsistent with a Congressional intent that Article 31, UCMJ, rights advisements would be required only for official investigations of suspected criminal offenses. *See United States v. Gibson,* 3 U.S.C.M.A. 746, 752–53, 14 C.M.R. 164, 170–71, 1954 WL 2109 (1954); *see also United States v. Duga,* 10 M.J. 206, 208–11 (C.M.A.1981).

In more recent cases, military courts have held that a person subject to the UCMJ who questions a suspect must give Article 31, UCMJ, rights warnings if the questioner "is participating in an official law enforcement or disciplinary investigation or inquiry." *United States v. Swift,* 53 M.J. 439, 446 (2000) (citing *United States v. Moses,* 45 M.J. 132, 134 (1996)), *cert. denied,* 531 U.S. 1150, 121 S.Ct. 1093, 148 L.Ed.2d 966 (2001); *see also United States v. Shepard,* 38 M.J. 408, 411 (C.M.A.1993). Our court recently concluded that:

> An official duty or responsibility to question a "suspect," for a purpose that is not primarily for disciplinary or law enforcement reasons, can negate the requirement for a rights advisement. Article 31, UCMJ, warnings are not required to be given by: (1) a military doctor, psychiatric social worker, or nurse prior to asking questions of a patient for medical diagnosis or treatment; (2) an in-flight aircraft crew chief prior to questioning, for operational reasons, an irrational crewman about possible drug use; (3) military pay officials questioning a servicemember about a pay or allowance entitlement; or (4) a negotiator trying to end an armed standoff, provided the discussion was truly designed to end the standoff, rather than to obtain incriminating statements to be used against the suspect at trial.

*United States v. Guyton–Bhatt,* 54 M.J. 796, 802 (Army Ct.Crim.App.2001) (footnotes omitted). In other words, Article 31, UCMJ, rights warnings are not required prior to official questioning focused on legitimate administrative issues related to a valid military mission. *See Swift,* 53 M.J. at 446 (and cases cited therein).

It is not unusual, or necessarily unlawful, in military society for a questioner to have official duties that legitimately encompass both administrative and law enforcement roles. *Id.* at 445–46. The dispositive question in appellant's case is whether LTC Doll's question to appellant at the URB was part of

---

4. Arguably, appellant's unconditional guilty plea waived any objection concerning his privilege against self-incrimination. *See* Mil. R. Evid. 304(d)(5) (a plea of guilty to an offense that results in a finding of guilty waives objections to the privilege against self-incrimination "with respect to that offense"). However, appellate defense counsel do not challenge the validity of appellant's findings of guilty, but ask that we order a rehearing on sentence because of the introduction of aggravation evidence during the sentencing phase of the trial that was allegedly obtained in violation of appellant's Article 31, UCMJ, rights. Government appellate counsel do not assert that the issue was waived. Under the facts of this case, we elect not to apply waiver and will address the issue on its merits. *See generally Estelle v. Smith,* 451 U.S. 454, 468 n. 12, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (rejecting waiver in death penalty case where unwarned statement was admitted against appellant in sentencing phase of trial and government appellate counsel did not argue waiver); *United States v. Hinojosa,* 33 M.J. 353, 354 (C.M.A.1991) (in a guilty plea case, court considered the merits of suppression issue after finding issue was waived by Mil. R. Evid. 304(d)(5)); *United States v. Streetman,* 43 M.J. 752, 755 (A.F.Ct.Crim.App. 1995) (after noting that strict reading of Mil. R. Evid 304(d)(5) could result in waiver, court considered merits of assertion that appellant was prejudiced in sentencing hearing by admission of evidence of his repeated refusals to submit urine specimens in a urinalysis case).

5. Article 31(b), UCMJ, provides that:

> No person subject to this chapter **may interrogate, or request any statement from** an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

(Emphasis added).

a legitimate administrative due process hearing provided to appellant prior to deciding whether to change his custody status because of his escape, or whether it was an "attempt[ ] to obtain incriminating statements to be used against him at trial." *Moses*, 45 M.J. at 135.

Considering the totality of the circumstances and our findings of fact, we hold that LTC Doll's inquiry to appellant was asked to afford appellant his basic due process [6] and USDB Reg. 15–1 regulatory rights in order to review, and potentially to significantly tighten, appellant's custody level within the USDB. Her question "was limited to that required to fulfill [LTC Doll's] operational responsibilities" to satisfy administrative due process procedures for a hearing conducted for legitimate penal and security purposes, independent of any UCMJ investigative or criminal, punitive purpose, "and there was no evidence suggesting [her] inquir[y was] designed to evade [appellant's] constitutional or codal rights." *United States v. Loukas*, 29 M.J. 385, 389 (C.M.A.1990). The URB was limited to its lawful administrative purpose and did not evolve into a situation where the "questioner [was] endeavoring to perfect a criminal case against the suspect." *United States v. Fisher*, 21 U.S.C.M.A. 223, 225, 44 C.M.R. 277, 279, 1972 WL 14092 (1972).

Lieutenant Colonel Doll's question to appellant was asked in her official capacity as the president of an administrative hearing that could significantly and adversely affect the daily conditions under which appellant would serve his sentence to confinement. Appellant was a well-educated person and an experienced inmate who understood that the URB was conducting an official hearing for the purpose of determining whether to tighten appellant's custody classification as a result of his escape. Appellant had participated in numerous USDB administrative hearings for violating the prison's rules and understood the procedures for these proceedings and their impact on his rights and privileges at the USDB. Even though LTC Doll was appellant's company-level commander, appellant's URB "created neither a coercive atmosphere nor an atmosphere where appellant thought [he] was required to cooperate." *United States v. Harvey*, 37 M.J. 140, 144 (C.M.A.1993).

We also reject the argument that because the URB was composed of correctional officers who had the authority to tighten appellant's custody classification, it constituted a "disciplinary proceeding" within the context of Article 31, UCMJ. Unscheduled Reclassification Boards do administratively discipline prisoners for violations of the penal institution's rules, but that does not convert these necessary and legitimate administrative proceedings into criminal trials. *See, e.g., United States v. Coder*, 39 M.J. 1006, 1009–10 (A.C.M.R.1994) (finding no entitlement to confinement credit for an "administrative disciplinary" sanction imposed by a USDB Discipline and Adjustment board). The punishment of incarcerated prisoners for infractions of penal rules of conduct "effectuates prison management and prisoner rehabilitative goals." *Sandin*, 515 U.S. at 485, 115 S.Ct. 2293. "Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law." *Id.*

■ Unscheduled Reclassification Boards are necessary operational proceedings that strike a reasonable accommodation between the legitimate government interest in a secure and safe prison environment and an inmate's rights to notice and an opportunity to be heard prior to administrative punishment for infractions of the penal institution's rules. We are mindful of the Supreme Court's admonition that "federal courts ought to afford appropriate deference and flexibility to [prison] officials trying to manage a volatile environment." *Sandin*, 515 U.S. at 482, 115 S.Ct. 2293. To require Article 31, UCMJ, rights warnings in such situations would be contrary to the Congressional intent behind Article 31, UCMJ, *see Gibson*, 14 C.M.R. at 170, and could adversely affect the

---

6. *See Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), and cases discussed therein, examining when prison regulations afford inmates a liberty interest protected by the Due Process Clause. The USDB regulatory procedures for URBs satisfied these constitutional due process requirements.

ability of USDB officials to enforce their rules of conduct; to protect cadre, staff, and inmates; and to safeguard the public. We hold that Article 31, UCMJ, does not apply to legitimate URBs conducted to maintain good order and discipline in the USDB by enforcing penal rules of conduct.

■ Accordingly, for all of the above reasons, we hold that LTC Doll was not required to advise appellant of his Article 31, UCMJ, rights prior to asking him, "[W]ould you like to make a statement?" or "Do you have anything you'd like to say?" or words to that effect.

### Inappropriate and Highly Disparate Sentence

■ Appellant also asserts that his sentence to confinement for nine years is inappropriately severe and highly disparate because Inmate Taylor, who initiated the scheme to escape, received an approved sentence suspending confinement in excess of three years. We find that appellant has satisfied his burden of demonstrating that his case and that of Inmate Taylor are "closely related" and that their sentences are "highly disparate." *United States v. Lacy*, 50 M.J. 286, 288 (1999). However, we further find that appellant is entitled to no sentence relief because there is a rational basis for the differing sentences.

First, absent a convening authority granting clemency in a co-accused's case for an unjustly severe sentence, we compare adjudged sentences, not approved ones. *See United States v. Ballard*, 20 M.J. 282, 283 (C.M.A.1985); *United States v. Olinger*, 12 M.J. 458, 460–61 (C.M.A.1982). Inmate Taylor was sentenced to confinement for fifty months, but the confinement in excess of thirty-six months was suspended for twelve months pursuant to the terms of a pretrial agreement. Appellant submitted a pretrial agreement with a four-year cap on confinement and a requirement that the convening authority transfer him from the USDB to the Federal Bureau of Prisons within sixty days. After the convening authority rejected this offer, appellant submitted a new pretrial agreement, without any sentence cap, that again required the convening authority to transfer appellant to the Federal Bureau of Prisons. Not surprisingly, the convening authority also rejected this pretrial agreement. Appellant's inability to obtain a pretrial agreement was due to his demand that he be transferred to another prison, apparently based upon his belief that "he is unable to function, and thus personally improve, within the conditions at the USDB." *See* Rule for Courts–Martial 1105 submission.

Second, appellant's criminal and disciplinary record was more negative than Inmate Taylor's. Inmate Taylor was serving a life sentence for premeditated murder, burglary, and larceny, but had no prior escape attempts. Inmate Taylor had adapted well to prison, had excellent prison evaluations, had only one adverse Discipline and Adjustment Board in over six years at the USDB, and was in a medium inside only custody status at the time of the escape.[7] Appellant was also serving a life sentence for murder, as well as numerous other offenses, including the successful escape from the Charlestown Navy Brig on 6 June 1993. Additionally, on 24 April 1995, a Discipline and Adjustment Board found appellant guilty of attempted escape from the USDB, threatening conduct, and possession of prohibited items. At the time of his trial, appellant had been found guilty at thirteen different Discipline and Adjustment Boards, two of which involved conduct that occurred after his escape from the USDB. He was found guilty of numerous offenses at these thirteen Discipline and Adjustment hearings, including assault consummated by a battery (three incidents), communicating a threat (four incidents), "conduct which threatens" (three incidents), arson, destruction of government property,

---

7. In making our sentence comparison, we took judicial notice of, and reviewed, Inmate Taylor's record of trial for this escape. Our authority to take judicial notice of relevant portions of other pertinent records during our Article 66, UCMJ, review is well established. *See, e.g., United States v. Durant*, 55 M.J. 258, 262 (2001); *United States v. McElroy*, 40 M.J. 368, 369 n. 1 (C.M.A.1994); *United States v. Budd*, 15 M.J. 465 (C.M.A.1983) (interlocutory order); *In re Clossen*, 14 M.J. 126 (1982) (interlocutory order); *United States v. Austin*, 20 C.M.R. 939, 941, 1955 WL 3667 (A.F.B.R.1955).

disobedience (four incidents), and disrespect.[8] Finally, in this court-martial, appellant was convicted of the additional offense of attempting to wrongfully appropriate a patrol car belonging to the Platte County, Missouri, Sheriff's Department. Appellant was shot twice while attempting to escape in this vehicle. Inmate Taylor had no such conviction and surrendered peacefully when surrounded by law enforcement officials after the escape.

Third, appellant's twelve-page unsworn statement, as well as his oral unsworn statement, purported to demonstrate his remorse and acceptance of responsibility for his misconduct. In reality, his remarks and complaints about the drudgery of prison life presented a picture of an inmate who thought that his escape was justified because he was unhappy, and who was not willing to adjust to the rigors and reality of a life sentence in prison.

We recognize that our statutory sentence review function is highly discretionary and that we have *carte blanche* authority to do justice. *See Lacy,* 50 M.J. at 288; *United States v. Claxton,* 32 M.J. 159, 162 (C.M.A. 1991). Exercising that authority, and considering the record as a whole and the nature and seriousness of appellant's offenses, as well as his character, we specifically find that a sentence of nine years is both just and appropriate given this appellant's long record of criminal and disciplinary infractions and escape attempts. UCMJ art. 66(c). *See also United States v. Snelling,* 14 M.J. 267, 268 (C.M.A.1982).

### Decision

We have considered the matters submitted by appellant pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), and find them to be without merit. The findings of guilty and the sentence are affirmed.

Judges CANNER and HARVEY concur.

---

8. There was no defense objection to the admissibility of the results of appellant's record of Discipline and Adjustment Board adjudications. *See generally United States v. Davis,* 44 M.J. 13, 20 (1996).